1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW MEXICO
 2
 3   AL-RASHAAD R. CRAFT,

         PLAINTIFF,
 4
     VS.                        NO. 2:17-CV-00469-JCH-SMV
 5
     CHAD WRIGHT, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY;
 6   AND AHMAD WHITE, IN HIS OFFICIAL AND INDIVIDUAL
     CAPACITY,
 7
         DEFENDANTS.
 8
             DEPOSITION OF TIMOTHY MCEACHERN
 9                APRIL 23, 2019
                     3:52 P.M.
10                ZEBAS LAW FIRM
                 502 W. ALTO DRIVE
11                HOBBS, NM 88240

12        PURSUANT TO THE NEW MEXICO RULES OF CIVIL

13   PROCEDURE, THIS DEPOSITION WAS:

14   TAKEN BY:      MR. JOSEPH M. ZEBAS, ESQ.

15   REPORTED BY:     STARLA D. WIGGINS, RPR,CCR,CRR
                  STAR REPORTING SERVICE
16                NM #11; TX #2114; NV #629
                  P.O. BOX 601
17                LOVINGTON, NM 88260
                  (505) 449-7589
18

19

20

21

22

23

24

25
```

EXHIBIT
3

1    that be anything that would indicate to you that he's

2    looking to incite violence?

3        A.        Sounds like he's talking, sir.

4        Q.        Okay.  So let's move on, okay?

5    (Video played)

6        Q.        Okay.

7    (Video played)

8        Q.        I'll try to speed it up for you, okay? I'm

9    sure you would appreciate that.

10   (Video played)

11       Q.        Okay.  As you are looking at this video, do

12   you see any children?

13       A.        No, sir.

14       Q.        As you are looking at this video, does this

15   gentleman, Al-Rashaad, also known as Rasben, does there

16   appear to be any indication he's attempting to incite

17   violence?

18       A.        He's just preaching, sir.

19       Q.        He's just preaching.  At any point did he

20   indicate that he wants to, for a black man to rise up

21   and kill all whites?

22       A.        Not that I heard.

23       Q.        Okay.  At any point did you hear that he

24   thinks that all women should be oppressed?

25       A.        Not that I heard on the video.

```
 1       Q.        At any point did you hear Mr. Rashaad say

 2    that Mexicans should become slaves?

 3       A.        Not that I heard on the video, sir.

 4       Q.        As a law enforcement officer, at this point

 5    have you seen this gentleman do anything in violation of

 6    the law?

 7       A.        From what I have seen on the video, no.

 8    (Video played)

 9       Q.        Again, stopping the video, Mr. Rasben

10    preaching on April 18th, 2015, do you have any reason to

11    believe this was the date that he was out here

12    preaching?

13       A.        I don't know, sir.

14       Q.        I'm asking.  Is there any reason to disagree

15    with that? That was the date that this video was taken?

16       A.        If that's what you say that was done, then I

17    mean --

18       Q.        Okay.

19       A.        -- sure.

20       Q.        The same questions as earlier.  Any

21    indication that Mr. Rashaad was looking to incite

22    violence?

23       A.        He's just preaching, sir.

24       Q.        Okay.  Is he protesting?

25       A.        I don't know.  Some of those words I don't
```

*STAR REPORTING SERVICE, LLC - 505-449-7589*

1    Q.      Okay.  You have no reason to disagree with

2  that, though?

3           MR. EVANS: Objection.  Form.  Go ahead.

4    A.      No, I don't.  No.

5  (Video played)

6    Q.      Okay.  So you have heard a little bit more

7  of his, Mr. Rasben's preaching sermon, whatever you want

8  to call it, yes?

9    A.      Yes, sir.

10   Q.      Okay.  At any point that you have heard so

11 far, is there any indication that Mr. Rasben has uttered

12 the following words?  Quote, "All white people need to

13 be murdered," closed quote.  Did you hear that?

14   A.      No, sir.

15   Q.      Okay.  At any point did you hear Mr. Rasben

16 state, quote, "The black man needs to rise up and kill

17 all the white people," closed quote.

18           Did you hear, at any point did he say those

19 words?

20   A.      Not that I have heard, sir.

21 (Video played)

22   Q.      Okay.  So again, at this point, before this

23 object comes in the screen, have you heard at any time

24 Mr. Rasben as displayed on this video on April 18th,

25 2015 that he was attempting to incite violence?

*STAR REPORTING SERVICE, LLC - 505-449-7589*

```
 1      A.        Not that I have seen, no.
 2      Q.        At any point did he indicate that, white man
 3   should be murdered?
 4      A.        I did not hear that, sir.
 5      Q.        Did you at any time hear him say that the
 6   black man needs to rise up and kill all the white
 7   people?
 8      A.        No, sir.
 9      Q.        Okay.  Do you see any children in the
10   background?
11      A.        No.
12      Q.        Does he -- has he been cussing and slurring
13   at any point in this video that you have seen?
14      A.        No.
15      Q.        And at this point as a reasonable, prudent
16   officer, you haven't seen any reason or any basis to
17   support any probable cause for him to be arrested?
18      A.        There's no crime being committed yet, sir,
19   that I have seen.
20   (Video played)
21      Q.        Okay.  So now can you describe what you have
22   seen on the video?
23      A.        Somebody is trying to interrupt him.
24      Q.        Do you know who that somebody is?
25      A.        No, I do not.
```

*STAR REPORTING SERVICE, LLC - 505-449-7589*

```
 1   thoughts.

 2              MR. EVANS: Same objection.  Go ahead.

 3       A.      I don't know.  Honestly, it's kind of

 4   comical.

 5       Q.      It is?

 6       A.      So far, but that's my opinion on it.

 7       Q.      Okay.  Fair enough.

 8   (Video played)

 9       Q.      I want you to count how many times she says,

10   "You Goddamn nut," okay?

11   (Video played)

12       Q.      Okay.  So how many times did you hear this

13   individual tell Mr. Rasben he was a Goddamn nut?

14       A.      Six times with the, G.D.

15       Q.      Okay.

16       A.      Then she just called him a nut four more.

17       Q.      Okay.  And I appreciate that.  Don't use the

18   Lord's name in vain, right? Okay.  So let's go back to

19   this now, and start this video again.

20   (Video played)

21       Q.      Once again, the same questions as earlier.

22   At this point has there been probable cause to arrest

23   Mr. Rasben?

24              MR. EVANS: Objection.  Form.  Foundation.

25       A.      Not from what I have seen on the video.
```

*STAR REPORTING SERVICE, LLC* - 505-449-7589

1      out and hurt her?

2          A.       Not in this video.

3          Q.       So as you sit here, he pushes this

4      individual away after he is stricken in the mouth by the

5      book, yes?

6                   MR. EVANS: Objection.  Form.

7          A.       He does something.  I don't know what he

8      did.

9          Q.       Okay.

10         A.       If he lunges, I can't say.  It's off camera.

11         Q.       After he is first stricken, yes?

12         A.       Yes.

13         Q.       Was that a, yes?

14         A.       Yes.

15         Q.       So before Susan Stone pushes Rasben's Bible

16     into his face, and into his mouth, did Rasben at any

17     point touch Susan Stone?

18                  MR. EVANS: Objection.  Form.  Go ahead.

19         A.       Not in the video.

20         Q.       So at this point is there, again the same

21     question as earlier.  Is there a probable cause to

22     arrest this individual?

23                  MR. EVANS: Objection.  Form and foundation.

24         A.       If that had been witnessed by an officer,

25     yes, there would be.

*STAR REPORTING SERVICE, LLC - 505-449-7589*

1    Q.        To arrest her or him?

2    A.        Her.

3    Q.        Because that could be construed as battery

4    and unwanted touching, true?

5              MR. EVANS: Objection.  Form and foundation.

6    Go ahead.

7    A.        It could be a misdemeanor battery, yes.

8    (Video played)

9    Q.        Okay.  Reasonable to believe he's acted in

10   self defense at this point?

11             MR. EVANS: Objection.  Form and foundation.

12   A.        I don't -- honestly, I don't know that

13   having a book flip up in your face would -- I don't

14   know.  I wouldn't react that way.

15   Q.        You don't know?

16   A.        I don't know.

17   Q.        Okay.

18   A.        I don't think I would react that way.

19   Q.        Okay.  And that's not the question.  The

20   question is, is there probable cause at this point to

21   arrest Mr. Rasben?

22             MR. EVANS: Objection.  Form and foundation.

23   A.        It depends.

24   Q.        On what?

25   A.        On how he felt about the book hitting him,

1    at this video, you would want to look at this video

2    because this would be evidence, yes?

3                 MR. EVANS: Objection.  Form.

4        A.      It could be evidence, yes.

5        Q.      What would make it not be evidence?

6        A.      On a misdemeanor battery, I'm not getting

7    into the guy's phone to look for that. It's not going to

8    happen.

9        Q.      You are not?

10       A.      No.

11       Q.      What are you going to look at?

12       A.      I'm going to take statements.  I'm going to

13   write a report, and I'm going to send it on to the City

14   Court, and if he would like to be a victim, he could go

15   file that charge to the City Court.

16       Q.      Likewise with her?

17                 MR. EVANS: Objection.  Form.

18       A.      I don't know what she's saying.  I don't

19   know anything about what happened, other than what you

20   are showing me, sir.

21       Q.      Okay.

22   (Video played)

23       Q.      Okay.  So now do you know who this

24   individual is that comes into this video?

25       A.      No, sir.

1

```
1               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW MEXICO
2
   AL-RASHAAD R. CRAFT,
3
        PLAINTIFF,
4
   VS.                        NO. 2:17-CV-00469-JCH-SMV
5
   CHAD WRIGHT, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY;
6  AND AHMAD WHITE, IN HIS OFFICIAL AND INDIVIDUAL
   CAPACITY,
7
        DEFENDANTS.
8
                 DEPOSITION OF MICHAEL THOMAS
9                      APRIL 25, 2019
                        11:00 A.M.
10                    ZEBAS LAW FIRM
                     502 W. ALTO DRIVE
11                   HOBBS, NM 88240

12        PURSUANT TO THE NEW MEXICO RULES OF CIVIL

13  PROCEDURE, THIS DEPOSITION WAS:

14  TAKEN BY:       MR. TIMOTHY L. WHITE, ESQ.

15  REPORTED BY:    STARLA D. WIGGINS, RPR,CCR,CRR
                    STAR REPORTING SERVICE
16                  NM #11; TX #2114; NV #629
                    P.O. BOX 601
17                  LOVINGTON, NM 88260
                    (505) 449-7589
18

19

20

21

22

23

24

25
```

**EXHIBIT 4**

1    your opinion, based on your experience as an officer

2    with the Hobbs Police Department that would have

3    prohibited you or Officer Ellis from taking Mr. Craft's

4    camera, subject to getting a warrant to see what the

5    video showed about this interaction between he and Mrs.

6    Stone?

7        A.        I don't believe there's anything that would

8    have prohibited it.

9        Q.        We have a memo that then Lieutenant Shane

10   Blevins created as a result of Mr. Craft making the

11   claim that became this lawsuit in which then Lieutenant

12   Blevins states that, "Upon reading the reports in this

13   case there was only one area of concern.  During the

14   initial investigation by Officer Ellis it is clear that

15   he observed that there was a camera set up on a tripod

16   in front of him, referring to Craft.  Due to this and

17   the potential evidence the phone had, statements made by

18   both Craft and Stone, the phone should have been seized

19   pending a search warrant."

20             Do you believe that's true? I mean, would

21   you agree with that assessment?

22       A.        It could have been taken.

23       Q.        Okay. Let me show you what's been previously

24   marked as Exhibit 5 to Officer Wright's deposition

25   yesterday.  It appears to be a photograph of our client,

*STAR REPORTING SERVICE, LLC - 505-449-7589*

1    Mr. Craft.  Do you recall ever seeing anyone take a

2    photograph like this of him as he was out there

3    preaching?

4        A.        No, I don't.

5        Q.        You did not take a photograph of this?

6        A.        I don't believe so.

7        Q.        Okay.  Do you have any understanding from

8    your work at the Hobbs Police Department, and let me

9    explain that.  This photograph was produced to us by the

10   City's attorneys in response to our request for any of

11   the evidence that led to Mr. Craft's arrest.

12            Do you know why this kind of photograph

13   would have been taken?

14       A.        I can't think of a particular reason.

15       Q.        Okay.  Did you ever see or learn about Hobbs

16   P.D. taking surveillance photographs of people like

17   this?

18       A.        In this instance, no.

19       Q.        In this instance? No. What about just

20   generally?  Is this something that happens on a regular

21   basis, to your knowledge?

22            MR. EVANS: Objection.  Form.  Go ahead and

23   answer, sir.  Go ahead.

24       Q.        He's objecting, because he doesn't like the

25   way I asked the question, but you still need to answer

1    if you can, sir.

2        A.        Fair enough.  Sometimes if there was a

3    person of interest in the sort of way.  So like I'll

4    give you an example.  Like if there was like a certain

5    person being released from prison for something, or like

6    a motorcycle gang, sometimes they do like a BOLO kind of

7    thing, kind of informational.  A little pamphlet or

8    something giving some basic facts and a photo.

9        Q.        But this would be someone -- these

10   photographs would be taken of someone that the police

11   either felt was engaged in some sort of criminal

12   activity, or possibly would be engaging in some sort of

13   criminal activity.  Is that fair?

14                 MR. EVANS: Objection.  Form.  Go ahead.

15       A.        I think that's fair.

16       Q.        I mean if I'm just standing out there at

17   Shipp and Broadway minding my own business, the officer

18   is not going to be taking pictures of me from across the

19   street from their car, are they?

20                 MR. EVANS: Foundation.  Go ahead.

21       Q.        In your experience, did you ever hear of

22   that sort of thing happening on a regular basis?

23                 MR. EVANS: Same.

24       A.        Not on a regular basis.  I have never been

25   involved in it.

1     Q.       Okay.  Do you recall speaking directly to

2   Mrs. Stone, the lady that was swearing, and hit Mr.

3   Craft's Bible on the videotape?

4     A.       I can't remember specifically.  I may have.

5     Q.       In your report on the second page, it

6   describes Officer Ellis speaking to Mrs. Stone and her

7   describing what she claims happened before you all were

8   called out.  Were you present for that conversation, do

9   you believe?

10     A.       Yes.

11     Q.       All right.  Did you have any specific direct

12   conversation with her, yourself, or were you just

13   listening in?

14     A.       If I recall right, I was listening.

15     Q.       Okay.  At the conclusion of the interaction

16   with all the folks out there at the scene, you and

17   Officer Ellis did not arrest anybody, right?

18     A.       That's correct.

19     Q.       And it was Officer Ellis' advice that we

20   could watch here in a minute on the videotape that if

21   Mr. Craft or Mrs. Stone felt that they wanted to press

22   charges, that they should go to the city attorney to do

23   that.

24             Do you recall that being the culmination of

25   this?

1    A.        Yes, sir.

2    Q.        Okay.  Did you talk to Officer Ellis before

3    that information was relayed to Mr. Craft to discuss

4    whether or not anyone should be arrested?

5    A.        I can't recall.  It's been a while.

6    Q.        Did you talk to him after this interaction

7    with Mr. Craft where the two of you were having

8    conversations about whether anybody should be arrested?

9    A.        I can't recall that either.  I left the

10   scene before he did.

11   Q.        Okay.  So from that, I'm going to assume,

12   and you tell me if this is correct, that you didn't have

13   any disagreement with Mr. Craft not being arrested?

14   A.        That's correct.

15             MR. EVANS: Objection.  Form.  Go ahead.

16   Q.        If you had disagreed with Officer Ellis'

17   handling of that, and leaving it at Mrs. Stone and Mr.

18   Craft being able to go to the city attorney if they

19   wanted to pursue it further, if you had disagreed with

20   Officer Ellis about that, what would you have done?

21   A.        I would have let him know that I disagreed

22   with him.

23   Q.        Okay.  Would it have taken any formal form,

24   or would it just be, hey, I kind of thought we should

25   have arrested somebody there, or how would you proceed

1    on that?

2       A.       If I believed differently, I would have

3    probably ended up taking this, and doing it myself.

4       Q.       Okay.  And you didn't, so I can assume from

5    that, that you believe that, that was the correct

6    resolution of this?

7                MR. EVANS: Objection.  Form.

8       Q.       True?

9       A.       Yes, sir.

10      Q.       All right.  So prior to this, you had never

11   heard of any calls out to this location for people

12   complaining about Mr. Craft being out there on the

13   street preaching?

14      A.       Not that I can recall before that.

15      Q.       Do you know Mark Stone?

16      A.       No.

17      Q.       Formerly owned the Desert --

18               MR. WHITE: Desert what?

19               MR. ZEBAS: Guns.

20      Q.       Desert Guns?

21      A.       No, I don't know him.

22      Q.       Okay.  Had you ever run into Susan Stone

23   before this day?

24      A.       I don't recall.  I don't think so.

25      Q.       After this incident where you were called

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


AL-RASHAAD R. CRAFT,

      PLAINTIFF,

VS.                    NO. 2:17-CV-00469-JCH-SMV

CHAD WRIGHT, IN HIS OFFICIAL
AND INDIVIDUAL CAPACITY;
AND AHMAD WHITE, IN HIS
OFFICIAL AND INDIVIDUAL
CAPACITY,

      DEFENDANTS.
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/



DEPOSITION OF BRANDON ELLIS

Taken on behalf of the Plaintiff



DATE & TIME:      Thursday, May 9, 2019
                   11:00 a.m. - 1:15 p.m.

PLACE:           Precise Reporting Services
                   301 West Bay Street
                   Suite 1400
                   Jacksonville, Florida 32202



Examination of the witness taken before:

Celeste O. Werkheiser, RMR, CRR, Notary Public
Precise Reporting Services
820 A1A North, Suite W14
Ponte Vedra Beach, Florida 32082
precisereporting@comcast.net



DEPOSITION OF BRANDON ELLIS
CONDUCTED ON 5/9/2019          14

14

1  Q   Okay.  Based on your review of the video, would
2  that -- had you seen that video on the day that you went
3  out on this call, would that have changed your decision
4  to arrest Mr. Craft?
5      MR. EVANS:  Objection.  Foundation.
6      THE WITNESS:  I never did arrest him.
7  BY MR. WHITE:
8  Q   Having seen that videotape, had you watched it
9  there that day, because you have -- let me back up.  You
10 have competing stories between Ms. Stone and Mr. Craft
11 about what happened before you got there, right?
12 A   Correct.
13 Q   All right.  Had you watched that video that
14 day, do you know if that would have changed your
15 decision not to arrest Mr. Craft?
16     MR. EVANS:  Objection.  Form and foundation.
17     THE WITNESS:  I don't think I'm understanding.
18 Because I've never made the decision to arrest him.
19 BY MR. WHITE:
20 Q   Right.  And what I'm trying to get at is, if
21 you had stood there that day and watched this videotape,
22 would that have led you to arrest him or would your
23 decision have been the same not to?
24     MR. EVANS:  Objection.  Form and foundation.
25     THE WITNESS:  I mean, it wouldn't have changed

15

1  the way that I did the report.  The only thing that
2  would have been added to the report is what I
3  observed in the video.  But the -- what I had told
4  him to do would have been the same, to contact an
5  attorney, and the attorneys would determine -- they
6  can bring it before the judge on the charge of
7  battery being -- on either one of them.
8  BY MR. WHITE:
9  Q   Do you know how it was that Mr. Craft came to
10 be arrested later?
11 A   No.  They never informed me of exactly what
12 happened.
13 Q   After you left this call, did you have any
14 conversation with Chad Wright about the incident or
15 whether Mr. Craft should be arrested?
16 A   No.
17 Q   Did anyone ever tell you that Officer Wright
18 told Detective White to go find a reason to arrest Mr.
19 Craft?
20 A   No.  Not to Officer White specifically.  I had
21 contacted Sergeant McEachren at the time.  He was my
22 supervisor.  Let him know of the incident and what was
23 going on.  And he had informed me that I would most
24 likely have to obtain a warrant for him because Chad
25 Wright had said that we needed to find a reason to

16

1  arrest him.
2  Q   Okay.  So Chad Wright told Officer McEachren --
3  A   Yes.
4  Q   -- that we needed to find, we being the Hobbs
5  police, needed to find a reason to arrest Mr. Craft?
6  A   Yes.
7      MR. EVANS:  Form.
8  BY MR. WHITE:
9  Q   And did you ever speak to Mr. Wright about
10 that?
11 A   No.
12 Q   Did anyone else ever say anything to you
13 about -- that the department needed to go find a reason
14 to arrest Mr. Craft?
15 A   No.
16 Q   Did you ever have any other conversation with
17 Mr. McEachren other than the one we were just speaking
18 about where he said Officer Wright told him someone
19 needs to go find a reason to arrest him?
20 A   No.  The only time he brought it up was when I
21 spoke with him on the phone while I was on scene.
22 Q   So that was before you even left the scene,
23 Officer McEachren was saying that?
24 A   Yes.
25 Q   Do you know why?  Did anyone ever tell you why

17

1  Officer Wright would have said we need to find a reason
2  to arrest him.
3  A   No.
4      MR. EVANS:  Objection.  Foundation.
5  BY MR. WHITE:
6  Q   Did anyone tell you --
7      MR. EVANS:  Was there an answer to the last
8  question?  I'm sorry.
9      COURT REPORTER:  He said no.
10     MR. EVANS:  Thank you.
11 BY MR. WHITE:
12 Q   Did anyone ever tell you after the fact --
13 strike that.  Did anyone ever tell you that you should
14 have arrested him while you were there at the scene?
15 A   No.
16 Q   When you reviewed the videotape of this
17 incident that was created on Mr. Craft's cell phone, did
18 you identify the woman who struck his Bible with her
19 lighter as Susan Stone?  Did you recognize her?
20 A   Yes.
21 Q   And you spoke to her there that day at the
22 scene.
23 A   Yes.
24 Q   When you're writing a report like Exhibit 1
25 that's in front of you, are you trained either on the

DEPOSITION OF BRANDON ELLIS
CONDUCTED ON 5/9/2019            18

**18**

1 job or in the academy on how to fill out these reports?
2    A   Yes.
3    Q   And when you worked for Hobbs Police
4 Department, did they have policies in terms of, number
5 one, that these reports should be accurate?
6    A   Yes.
7    Q   And did they have policies regarding how timely
8 they should be completed?
9    A   Yes.
10    Q   And how quickly would this report with your
11 narrative have been created with the descriptions of
12 your interactions with these folks out there on the
13 scene that day?
14    A   It would have been that day before I went home.
15    Q   Okay.  So that was the policy, you would have
16 to have created this on 4-18?
17    A   Yes.
18    Q   And in fact, was there a policy that you could
19 be disciplined for not accurately reporting incidents
20 like this?  If your report had false allegations in it,
21 would that be something you might be subject to
22 discipline for while you were at Hobbs police?
23    A   I believe so, yes.
24    Q   Before you wrote up this report, did you listen
25 to the audio CD?

**19**

1    A   Yes.
2    Q   And so is there anything, if you recall, that
3 would have been on the CD of any substance that wouldn't
4 have made it into this report?
5    A   I'm not understanding.
6    Q   Well, for example, if Ms. Stone had said, "Mr.
7 Craft is out here preaching and saying that all the
8 black people should rise up and kill all the white
9 people," if she said that to you, and it's on the CD,
10 that would have made its way into this report; is that
11 correct?
12        MR. EVANS:  Objection.  Form.
13 BY MR. WHITE:
14    Q   I'm not saying she said that.  I'm just using
15 that as an illustration.
16    A   Possibly.  If I felt that it was something that
17 needed to be said.  I try to stick to the facts of what
18 happened.
19    Q   Okay.  And in this narrative, in your report,
20 in Exhibit 1, you don't note that Ms. Stone said
21 anything you like "all white people need to be
22 murdered."
23        She didn't say that to you, did she, on the
24 scene?  That Mr. Craft was saying that?
25    A   I don't remember.

**20**

1    Q   Okay.  If she had, would that have gone into
2 your report, into this narrative?
3    A   I'm not too sure.
4    Q   I'm talking about in terms of how you create
5 these reports, Mr. Ellis.  If she had said, "Mr. Craft
6 is standing out here saying 'all white people need to be
7 murdered,'" if she had told you that at the scene at the
8 time on 4-18, would that have made it into your report?
9        MR. EVANS:  Objection.  Form.
10        THE WITNESS:  Possibly.  I couldn't say.  I
11 mean, with my experience now with law enforcement I
12 would have put something like that in there.
13 BY MR. WHITE:
14    Q   Okay.  And at the time, you had been a law
15 enforcement officer in Hobbs for two or three years as
16 of April of 2015?
17    A   I believe so.
18    Q   Right.  And so would that have changed?  I
19 mean, in terms of how you write up reports?
20    A   I think I've been a little bit more detailed as
21 time went on with my reports than I was for my first
22 couple years, yes.
23    Q   Did you also review the criminal complaint that
24 Detective White filled out that I sent for you to look
25 at?

**21**

1    A   I did not.  I read my report.
2    Q   In your report, you report that Ms. Stone
3 alleged that she made the statement, "I have freedom of
4 speech, too, you nut.  Shut up."
5        Do you see where I'm reading that?
6    A   Yes.
7    Q   "Susan advised after she made the statement to
8 Al-Rashaad he pushed her with both his hands causing her
9 to fall backwards to the ground."
10        Do you see where I'm reading from?
11    A   Uh-huh.
12    Q   And I read that correctly?
13    A   I lost my spot.
14    Q   That's okay.  "Susan advised -- "
15    A   I got it.
16    Q   And I read that correctly?
17    A   Read it one more time.
18    Q   "Susan advised after she made the statement to
19 Al-Rashaad he pushed her with both his hands causing her
20 to fall backwards to the ground."
21        I read that correctly?
22    A   Yes.
23    Q   And at the scene that was her statement that
24 immediately after she made this comment, "I have freedom
25 of speech, too, you nut.  Shut up," that Rashaad pushed

22

1  her.
2      A   Yes.
3      Q   Do you recall watching the video if that was a
4  true statement or not?
5      A   No, it was not.
6      Q   Of course, you didn't have the video at that
7  time so you didn't know that, of course, right?
8      A   Right.
9      Q   Did you see also where in the conversation that
10  you had with Mr. Israel Loya-Lopez that he claimed that
11  he saw Al-Rashaad push Susan and that Susan never
12  touched Al-Rashaad?  Did you see on the video whether
13  that was a true statement or not?
14          MR. EVANS:  Objection.  Form.
15          THE WITNESS:  If his statement was correct?
16  BY MR. WHITE:
17      Q   Yeah.
18      A   No.  His statement was incorrect.
19      Q   Because she's the one who initiated the
20  contact.  You can see that on the video.  Do you agree
21  with me?
22      A   Yes.
23      Q   Did Detective White ever come to you and ask
24  about your conversations with my client or Ms. Stone or
25  Mr. Loya-Lopez there at the scene that day?

23

1      A   No.
2      Q   Did he ever speak to you about that?
3      A   No.
4      Q   Did he ever come to you even to ask for this
5  report that you had created?
6      A   No.
7      Q   Have you, when you were working with Hobbs
8  police, ever had any other incident like this where you
9  went out on a call, did not make an arrest, and then you
10  learned later that the person did get arrested by
11  somebody else for the same incident?
12      A   Yes.  Whenever investigations is involved and
13  the case gets passed on to them, they usually get
14  warrants out and things like that and make their
15  arrests.
16      Q   Would you be able to tell me how many times
17  that happened where you went out to a call, chose not to
18  arrest anybody, but then learned that someone was indeed
19  arrested for that incident later?
20      A   Only when -- I couldn't say the amount of
21  times.  It's only when investigations take over.
22  Usually when we call them, when we're on any kind of
23  felony crime, they usually take it over and make the
24  arrests.
25      Q   And so for a misdemeanor battery like this,

24

1  have you ever seen anybody get handed over to
2  investigations and be arrested later?
3      A   No.
4          MR. EVANS:  Form.
5  BY MR. WHITE:
6      Q   Do you know why that happened in this case?
7          MR. EVANS:  Tim, what was the answer to the
8  last question?
9          COURT REPORTER:  No.
10          MR. EVANS:  Mr. Ellis, this is Bryan Evans.  I
11  realize this situation is kind of awkward and
12  unwieldy with me being on the phone, but if you
13  don't mind pausing very briefly before answering in
14  case I need to make an objection, I would appreciate
15  that.
16          THE WITNESS:  Okay.  No problem.
17          MR. EVANS:  Thank you.
18  BY MR. WHITE:
19      Q   Do you know why in this instance someone did
20  hand this to investigations and Mr. Craft ended up
21  getting arrested?
22          MR. EVANS:  Objection.  Foundation.
23          THE WITNESS:  I do not know the reason why.
24  BY MR. WHITE:
25      Q   Okay.  So other than the comment that Officer

25

1  McEachren made to you that Officer Wright said there
2  needed to be an arrest made, they needed to find a
3  reason to arrest Mr. Craft, you haven't heard anything
4  else about why that happened.
5      A   No.
6      Q   Did anyone ever ask you about looking at the
7  video of this incident as part of the Hobbs police
8  investigation?
9      A   No.
10      Q   Had you ever seen that video before I sent you
11  that copy?
12      A   Yes.
13      Q   When did you see it before?
14      A   Briefly with Joseph Zebas.
15      Q   Okay.  When you spoke to Ms. Stone that day,
16  and refer to your narrative if you need to refresh your
17  memory at all, did never say to you that Mr. Craft was
18  making repeated racially offensive comments?
19      A   I can't remember if she said racial statements
20  or not.  I do remember her saying something about
21  cursing in front of kids or something like that.  I just
22  can't remember everything that she said about what he
23  was preaching about.
24      Q   And when you watched the video, did you see or
25  hear him making -- saying -- using profanity in front of

DEPOSITION OF BRANDON ELLIS
CONDUCTED ON 5/9/2019          58

58

1  want to explore it a little bit more.  Before this
2  incident happened that day, had there been any
3  supervisors with the Hobbs Police Department that had
4  communicated to the other officers in any way that they
5  were aware of Mr. Craft preaching on the street and that
6  his preaching in and of itself was not a violation of
7  any law?
8      A    Not at any briefing that I was attending.
9      Q    Even if it was not at any briefing that you
10  attended, had you heard just water cooler talk or a memo
11  stuck in your mailbox or in any form at all the word
12  come out that Mr. Craft was out there preaching and that
13  he was not in violation of the law by his preaching?
14     A    No.
15     Q    So had the fact that Mr. Craft had been
16  preaching out there on the sidewalk before this
17  incident, had that fact alone been made known to you in
18  any way at all before this incident?
19     A    No.
20     Q    Had you learned of his preaching on the
21  sidewalk before this incident from any means or any
22  source at all?
23     A    No.
24     Q    So your trip out there to deal with this
25  incident that day was the first time you had ever been

60

1  of the Hobbs Police Department disseminating any kind of
2  information about how to address street preachers.
3      A    That is correct.
4      Q    All right.  This incident happened on Broadway
5  Street in Hobbs; am I correct?
6      A    Yes.
7      Q    That street runs basically right through the
8  middle of downtown Hobbs, correct?
9      A    Yes.
10     Q    So it's not unusual for Hobbs police officers
11  in general to patrol in that area, is it?
12     A    No.
13     Q    And it's not improper for officers to patrol in
14  that area, is it?
15     A    No.
16     Q    Are you aware, Mr. Ellis, of any other time
17  that any Hobbs police officers had ever interacted with
18  Mr. Craft in any way before the day of this incident?
19     A    Can you repeat that?
20     Q    Are you aware of any other time before the day
21  of this incident that any other Hobbs police officers
22  had ever interacted with Mr. Craft in any way?
23     A    Before the incident, no.  I was told by him at
24  the time that he had spoken with somebody but I didn't
25  know who it was.

59

1  made aware that he had been preaching out there?
2      A    Yes.
3      Q    Before this incident had there been any
4  discussion among any of the officers with the Hobbs
5  Police Department about how to approach or deal with or
6  interact with street preachers there in Hobbs at all?
7      A    Not to me, no.
8      Q    When you say not to me, what do you mean by
9  that?
10     A    I believe there was, due to my conversation
11  with Sergeant McEachren, but I had not heard anything
12  prior to me arriving on scene.
13     Q    What did Sergeant McEachren tell you that fits
14  within this category of your answer?
15     A    When I told him that what was going on with the
16  incident he had told me even though it was a petty
17  misdemeanor crime that I was most likely going to have
18  to obtain an arrest warrant for the subject due to
19  Lieutenant Wright at the time stating that we needed to
20  find a reason to arrest him.
21     Q    And that of course was said to you after the
22  incident occurred, right?
23     A    Yes.
24     Q    So prior to that conversation with Officer
25  McEachren, you had never been made aware from any source

61

1      Q    Do you remember him giving you the name of that
2  person that he had spoken with?
3      A    I can't remember if he did or not.
4      Q    So other than that comment from Mr. Craft,
5  you're not aware from any other source of any other time
6  any Hobbs police officers had ever interacted with Mr.
7  Craft in any way before this incident.
8      A    No.  I'm not aware of any.
9      Q    Are you aware of any other time before this
10  incident where any Hobbs police officers had ever
11  observed or watched Mr. Craft doing his street
12  preaching?
13     A    No, I'm not.
14     Q    If there were such a situation like that where
15  some other officers had previously been on patrol and
16  had watched Mr. Craft and what he was doing for a few
17  minutes, you wouldn't find any problem with that, would
18  you?
19     A    I'm not understanding.
20     Q    If there were other occasions where Hobbs
21  police officers while they were out on patrol had paused
22  for a little bit and watched Mr. Craft doing his street
23  preaching on other occasions, you wouldn't see any
24  problem with that, would you?
25     A    No.

DEPOSITION OF BRANDON ELLIS
CONDUCTED ON 5/9/2019          90

90

1 it was that might have been expressing an opinion that
2 Craft should be arrested?
3    A   No.
4    Q   Whether you identify them or not, do you recall
5 anybody else there at the scene saying in any way at all
6 that you needed to do something about this?
7    A   No.  The only people that I documented were the
8 ones that actually witnessed the incident happen.
9    Q   How long was your conversation with McEachren?
10   A   I don't remember.
11   Q   Your best estimate.
12   A   It was too long ago.  I just don't remember.
13   Q   You don't even have an estimate.
14   A   No.
15   Q   Tell me as best you can recall exactly what
16 Officer McEachren said to you.
17   A   When I told him what was going on he had told
18 me he knew who I was talking about and that he just --
19 he had told me that nothing can be done right now but
20 you most likely will have to get a warrant for him later
21 because Chad Wright had said that we needed to find a
22 reason to arrest him.
23   Q   Okay.  So do you know what Officer McEachren
24 meant when he said nothing can be done about this right
25 now?

91

1    A   Which means we didn't witness him do anything
2 so we legally can't arrest him.
3    Q   Did Officer McEachren say anything else in that
4 phone conversation you had with him that you recall?
5    A   Not that I remember.
6    Q   Did you ever communicate with any other
7 personnel at the Hobbs Police Department concerning this
8 incident besides what we've covered here today so far?
9    A   No.  I don't think so.
10   Q   Anything you remember today?
11   A   No.
12   Q   When you had this conversation with Officer
13 McEachren and he related to you what Officer Wright had
14 supposedly said, did you have the impression that
15 Officer Wright had said that during those few minutes
16 since the incident had occurred or had said it sometime
17 in the past?
18   A   It would have been -- I would assume it was in
19 the past.  I was currently on the scene.
20   Q   Right.  Okay.  Specifically, did Officer
21 McEachren say anything else about anything that Officer
22 Wright may have said about Mr. Craft or this incident?
23   A   No.
24   Q   And I assume in that conversation Officer
25 McEachren did not say anything about Officer White.

92

1    A   No.
2    Q   Correct?
3    A   Correct.
4    Q   Is there anything else about that conversation
5 that you had with Officer McEachren that you think is
6 important in any way that you haven't testified about so
7 far?
8    A   No.
9    Q   All right.  I'm going to keep scrolling through
10 my notes here.  I think I'm about done.
11       (Pause.)
12       MR. EVANS:  Very good.  I'll pass the witness.
13       MR. WHITE:  Just a couple follow-up.
14             REDIRECT EXAMINATION
15 BY MR. WHITE:
16   Q   Mr. Ellis, you told us about the PIP that you
17 had been put on.  It's a performance improvement plan;
18 is that right?
19   A   Yes.
20   Q   And did some part of that have to do with your
21 report writing?
22   A   Yes.
23   Q   What about your report writing were they
24 counseling you on?
25   A   We had switched to a new system.  We switched

93

1 from -- it was called the CAPER system.  And it was just
2 a whole new system and I was having issues not filling
3 in all the boxes correctly.  And that's the reason that
4 they gave me for involving that with the PIP.
5    Q   And that was when, the PIP, 2016, you said?
6    A   2014.
7    Q   2014.  Okay.  By the time of this incident in
8 April of 2015, had you complied with whatever it was
9 they were counseling you on as far as report writing?
10   A   Yes.  They removed me from the PIP.
11   Q   And just real briefly, what was your suspension
12 for?
13   A   It was for insubordination.
14   Q   And what were they saying you did that was
15 insubordinate?
16   A   I talked about something that I wasn't supposed
17 to with another officer.
18   Q   Okay.  Did it have anything to do with this
19 case?
20   A   No.
21   Q   Who was the officer who gave you that
22 discipline?
23   A   The Chief, Chief McCall.
24   Q   And who was your supervisor at that time?
25   A   My direct supervisor was Herrera.

04/18/2017 16:12 FAX                                                    ☑020/027

Magistrate Criminal Rule 16

STATE OF NEW MEXICO

MAGISTRATE COURT
LEA              COUNTY          # 121973        **ORIGINAL**
STATE OF NEW MEXICO

v.
Rasben, Alrashaad (B/M; ~~1978~~
SOC: Unknown                              M-26-FR-2015-00258
~~3618 Abinger Ln,~~ Houston, TX 77088     H15-02710            Number

Defendant(s)

### WARRANT FOR ARREST

THE STATE OF NEW MEXICO TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:[1]

BASED ON A FINDING OF PROBABLE CAUSE, YOU ARE HEREBY COMMANDED to arrest the above-named
defendant and bring the defendant without unnecessary delay before me[2] to answer the charge
of: __Aggravated Battery, 1 count, which is a 3rd degree felony and__
__Disorderly Conduct, 1 count, which is a Petty Misdemeanor__ (0071)(1535)
_____ (here state common name and description of offense charged)

contrary to Section(s) 30-3-5C; 30-20-1A _____ (NMSA 1978)

Dated this 23rd day of April , 2015 .

                                                        _____ JUDGE

**In-State Bond** $4,000.00 Cash or Surety

**Out-of-State Bond** $4,000.00 Cash

### RETURN WHERE DEFENDANT IS FOUND

I arrested the above-named defendant on the ____ day of _____, 20__,

and served a copy of this warrant on the ____ day of_____, 20__.

                                                        _____
                                                           Signature

                                                        _____
                                                             Title

This is a copy of a document maintained by the ...
section of the Hobbs Police Department and released ...
accordance with specific Records Release policy. Use ...
is information may be restricted or limited by law an ...
holder assumes responsibility for compliance ...

[1] An arrest warrant may be directed to a full-time salaried state or county law enforcement officer, a municipal police officer, a campus security officer, or an Indian tribal or pueblo law enforcement officer.
[2] If the judge is unavailable, defendant must be brought forthwith before designee for setting of conditions of release. A defendant accused of a bailable offense may not be held without the setting of conditions of release. (Magistrate Rule 1221).

1 copy - Return of Service First Copy; 1 copy - Defendant's Copy; 1 copy - Return of Service Second Copy
),1976; amended October 1,1978; October 1,1985.  Criminal Form 9.30                        Supreme Court: Approved October

RECEIVED
Date 4/03/15 By SS


EXHIBIT 7

3-15"

04/18/2017 16:13 FAX                                                    ☑ 023/027

## CRIMINAL COMPLAINT

MAGISTRATE COURT
LEA COUNTY                        Page 1                    ATTACHMENT "A"
STATE OF NEW MEXICO
            vs                                       No.
Rasben, Alrashaad (B/M; ● ●●●/1978)
SOC: Unknown
3618 Abinger Lee Houston, TX 77068 ,Defendant(s)

Victim:  Susan Stone                    Suspect:  Alrashaad Rasben

Victim/Witness: Israel Loya-Lopez

On Saturday, April 18th, 2015, at approximately 1413 hours, Officer B. Ellis was dispatched to the intersection of Shipp and Broadway, in reference to a battery.

Officer Ellis documented that upon his arrival, he made contact with Susan Stone. Stone reported that she had been battered by a black male at the intersection of Shipp and Broadway prior to police arrival. Stone told Officer Ellis that there was a black male preaching on the north sidewalk of the intersection, later identified as Alrashaad Rasben. Stone told Officer Ellis that Rasben made several racial comments like "all white people need to be murdered" and "the black man needs to rise up and kill all of the white people". Susan also told Officer Ellis that Rasben had been using profanity when he preaches in the presence of children.

She told Officer Ellis that she walked to Rasben's location on the sidewalk and they began arguing about religion and him making the racial statements. She said Rasben was recording himself with a cell phone attached to a tripod. She told Officer Ellis that she took her lighter out and started waving it in front of his camera.

Stone said Rasben told her he has the freedom of speech and she responded by saying "I have freedom of speech too you nut" and told him to shut up. She reported that immediately after she made this statement, Rasben stood in front of her and pushed her with both of his hands, causing her to fall backwards to the ground and hit the back of her head on the sidewalk.

Stone said her head and buttocks made contact with the concrete after Rasben pushed her. She told Officer Ellis the police were contacted and Hobbs EMS responded. Stone refused medical transport at

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FACTS SET FORTH ABOVE ARE
TRUE TO THE BEST OF MY INFORMATION AND BELIEF. I UNDERSTAND THAT IT IS A
CRIMINAL OFFENSE SUBJECT TO THE PENALTY OF IMPRISONMENT TO MAKE A FALSE
STATEMENT IN A CRIMINAL COMPLAINT.

| Ahmaad White        D11      [signature] | Diana Luce |
|---|---|
| COMPLAINANT | APPROVED |
| Detective Hobbs Police | District Attorney |
| TITLE (if any) | TITLE |

3-18

/18/2017 16:13 FAX                                                                ☑024/027

## CRIMINAL COMPLAINT

MAGISTRATE COURT
LEA COUNTY                              **Page 2**                    ATTACHMENT "A"
STATE OF NEW MEXICO
            vs                                              No.
Rasben, Alrashaad (B/M;  ~~████████~~
SOC: Unknown
~~██████████~~    Houston, TX ~~████~~ ,Defendant(s)

the scene and was later taken to LRH by her husband, Mark Stone. She told Officer Ellis that her buttocks, back and head were hurting.

Officer Ellis documented that he then made contact with Alrashaad Rasben as he was still preaching on the north sidewalk of the intersection Shipp and Broadway. Officer Ellis documented that he observed Rasben had a camera set up on a tri pod in front of him as he preached. Rasben told Officer Ellis that he was preaching and Stone walked up to him. He told Officer Ellis that Stone pulled out a lighter and started waving it in front of his camera.

He said Stone was "talking smack" to him as she waived the lighter in front of his camera. He told Officer Ellis he ignored Susan because she wasn't touching him and continued preaching. Officer Ellis documented that Rasben said after approximately 3 minutes, Stone pushed him. He said after Stone pushed him, he pushed her back.

Officer Ellis documented that he then made contact with Israel Loya-Lopez who informed him that he witnesses the incident. Lopez reported observing Rasben preaching at the intersection of Shipp and Broadway. Lopez told Officer Ellis that he observed Stone walk over to Rasben waive her lighter in front of his camera. Lopez said he then observed Rasben push Stone to the ground. Lopez informed Officer Ellis that Stone did not touch Rasben prior to him pushing her down. He described the force Rasben used as "the way you would push a 300 pound man".

Officer Ellis logged an audio CD of the contacts made with the subject involved in this incident into evidence.

On Sunday, April 19th, 2015, I, Detective Ahmaad White, was contacted and informed of this incident.

On this date, I made contact with Israel Loya-Lopez at 1105 W. Lea. Lopez told me he witnessed the entire incident. My contact with Lopez was audio recorded. He told me as he stood and listened to

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FACTS SET FORTH ABOVE ARE TRUE TO THE BEST OF MY INFORMATION AND BELIEF. I UNDERSTAND THAT IT IS A CRIMINAL OFFENSE SUBJECT TO THE PENALTY OF IMPRISONMENT TO MAKE A FALSE STATEMENT IN A CRIMINAL COMPLAINT.

Ahmaad White        D11     _(signature)_

This is a copy of a document maintained and released ... ection of the Hobbs Police Department and in ... ccordance with specific Records Release policy. Use ... nformation may be restricted or limited by law. ... s holder assumes responsibility for compliance ...

COMPLAINANT                                                          APPROVED

Detective Hobbs Police Department                    District   Attorney
TITLE (if any)                                            TITLE

# CRIMINAL COMPLAINT

| MAGISTRATE COURT | | |
|---|---|---|
| LEA COUNTY | **Page 3** | ATTACHMENT "A" |
| STATE OF NEW MEXICO | | |

STATE OF NEW MEXICO
      vs                                          No.
Rasben, Alrashaad (B/M; [redacted])
SOC: Unknown
[redacted]          Houston, TX [redacted]   ,Defendant(s)

Rasben making racial remarks like "white people and white women should be murdered" and "black people should rise up and make Mexicans their slaves", he observed Susan Stone walk towards Rasben.

Lopez said Stone waived a lighter in front of Rasben's camera and argued about the statements he was making. He told me as Stone stood about three feet away from Rasben, he observed Rasben walk in front of Stone and push her with both hands in her chest. He said he saw Stone's feet completely off of the ground before she hit her head on the concrete.

Lopez told me he ran to Stone and immediately began to assist her to her feet. He told me he told Rasben that he was wrong for pushing Stone. Lopez said Rasben responded and said "where I'm from, you don't put your hands on me and expect me not to put my hands on you". Lopez said he told Rasben "she never touched you". He said the police arrived shortly after these statements. He told me Rasben continued making racial statements after he pushed Stone down. Lopez also said that he made a comment about pushing Stone down as if it was not wrong. Lopez told me he was offended by the racial statements made by Rasben.

Lopez said Rasben pushed Stone "the way you would push a 300 pound man" and told me it made him angry. I terminated my interview with Lopez at this time.

I then made contact with Susan Stone at her residence. My contact with Lopez was audio recorded. I observed Stone to be lying on the couch of her living room. She informed me that she was unable to move throughout her residence, perform her daily duties, and sit upright without assistance from her husband, Mark Stone. She said her head was still hurting, along with her back and buttocks caused by being pushed. Stone told me she observed Rasben making several racial remarks about how women should be beaten into submission and how white people should all be murdered so the black race could dominate everything.

---

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FACTS SET FORTH ABOVE ARE TRUE TO THE BEST OF MY INFORMATION AND BELIEF. I UNDERSTAND THAT IT IS A CRIMINAL OFFENSE SUBJECT TO THE PENALTY OF IMPRISONMENT TO MAKE A FALSE STATEMENT IN A CRIMINAL COMPLAINT.

| Ahmaad White    D11   _[signature]_ | Diana Luce |
|---|---|
| COMPLAINANT | APPROVED |
| Detective Hobbs Police Department | District Attorney |
| TITLE (if any) | TITLE |

04/18/2017  16:14 FAX                                                    ☑026/027

# CRIMINAL COMPLAINT

MAGISTRATE COURT
LEA COUNTY                          Page 4                    ATTACHMENT "A"
STATE OF NEW MEXICO
                  vs                                  No.
Rasben, Alrashaad (B/M; ▮▮▮▮▮▮)
SOC: Unknown
▮▮▮▮▮▮, Houston, TX ▮▮▮▮, Defendant(s)

She told me she waived her black leather lighter case in front of the camera and told Rasben to stop making racial comments. She said Rasben responded by saying "I have the freedom of speech" and "this is public property". She said she told him "I have the freedom of speech too" and "shut up, you nut". She said there was a few feet in between them and Rasben closed the distance until he was standing directly in front of her. She said he then pushed her with both hands in her chest, causing her to fall onto her back and hit her head.

She told me the police were contacted and EMS responded to the scene. She was unable to provide any further statements that were made after she was pushed.

I photographed Stones injuries, which included several bruises on the outside of her right forearm and a half dollar size bruise on the back of her head. I transferred the photos onto a photo CD and logged them into evidence.

I then contacted District Attorney Diana Luce and informed her of the incident. She agreed that the District Attorney's office would pursue the charge of Aggravated Battery, 1 count, which is a Misdemeanor and Disorderly Conduct, 1 count, which is a Petty Misdemeanor.

The above occurred in Hobbs, Lea County, New Mexico.

I, the affiant, believe that probable cause does exist that the defendant's, Alrashaad Rasben's, actions are contrary to NMSA 30-3-5B, (1 count), which is a Misdemeanor and NMSA 30-20-1A, (1 count), which is a Petty Misdemeanor.

On Thursday, April 23rd, 2015, Mark Stone contacted me and informed me that he took Susan Stone to NorLea General Hospital again, due to her pain increasing and an additional knot on her head. He told me she was acting verbally aggressive, due to the pain and was "not like herself". He said Susan was experiencing severe mood swings and displaying emotional distress because of the incident. He told me

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FACTS SET FORTH ABOVE ARE TRUE TO THE BEST OF MY INFORMATION AND BELIEF. I UNDERSTAND THAT IT IS A CRIMINAL OFFENSE SUBJECT TO THE PENALTY OF IMPRISONMENT TO MAKE A FALSE STATEMENT IN A CRIMINAL COMPLAINT.

Ahmaad White    D11   _signature_              Diana Luce

COMPLAINANT                                     APPROVED

Detective Hobbs Police Department              District Attorney
TITLE (if any)                                 TITLE

...of ... maintained by the Hobbs Police Department and released in cordance with specific Records Release policy. Use ...ion information may be restricted or limited by law an... holder assumes responsibility for compliance...

3-21

04/18/2017 16:14 FAX                                                    ☑ 027/027

# CRIMINAL COMPLAINT

**MAGISTRATE COURT**
**LEA COUNTY**                           Page 5                    ATTACHMENT "A"
**STATE OF NEW MEXICO**
                        vs                                    No.
Rasben, Alrashaad (B/M; ~~          ~~ )
SOC: Unknown
~~            ~~ Houston, TX ~~      ~~ ,Defendant(s)

he was initially informed that her condition should be monitored over a period of several days and if it did not improve, she was to be brought back to the hospital for additional treatment.

Mark Stone said that Susan's condition had not improved. Mark Stone told me that Susan was unable to remember what the current date was. He said after taking her back to NorLea General Hospital in Lovington, New Mexico on Tuesday, April 21st, 2015. Mark Stone told me that she was given an additional CAT scan, but informed Mark that she believed she was still in Hobbs.

He said he was informed by Dr. Carver in the emergency room that Susan had sustained a severe concussion. Mark Stone said Dr. Carver told him to watch her closely for the next week and to ensure that she got plenty of rest. He also told Mark Stone that if her condition was worse after one week, she was to be brought back into the emergency room.

On Thursday, April 23rd, 2015, I contacted District Attorney Diana Luce and informed her of Susan Stone's condition, as it had not improved. DA Luce agreed that the District Attorney's office would agree to amend the above approved charge to Aggravated Battery (GMH), 1 count, which is a 3rd degree felony and Disorderly Conduct, 1 count, which is a Petty Misdemeanor.

The above occurred in Hobbs, Lea County, New Mexico.

I, the affiant, believe that probable cause does exist that the defendant's, Alrashaad Rasben's, actions are contrary to NMSA 30-3-5C, (1 count), which is a 3rd degree felony and NMSA 30-20-1A, (1 count), which is a Petty Misdemeanor.

... ...ction of the Hobbs Police Department and released i cordance with specific Records Release policy. Use s information may be restricted or limited by law an holder assumes responsibility for compliance will

I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FACTS SET FORTH ABOVE ARE TRUE TO THE BEST OF MY INFORMATION AND BELIEF. I UNDERSTAND THAT IT IS A CRIMINAL OFFENSE SUBJECT TO THE PENALTY OF IMPRISONMENT TO MAKE A FALSE STATEMENT IN A CRIMINAL COMPLAINT.

Ahmaad White      D11 _Ahmaad White D11_           Diana Luce
COMPLAINANT                                        APPROVED

Detective Hobbs Police Department                  District Attorney
TITLE (if any)                                     TITLE

                                                              3-22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**AL-RASHAAD CRAFT,**

       Plaintiff,

vs.                        No. 2:17-cv-00469 JCH-SMV

**CHAD WRIGHT**, et al,

       Defendants.

## <u>AFFIDAVIT OF WILLIE HENRY</u>

Hon. Willie Henry, of full age and sound mind, declares the following:

1. My name is Willie Henry and I have been a Magistrate Judge in Lea County New Mexico, 5th Judicial District for over eight years.

2. The affidavit presented to me on or about April 18, 2015 by Ahmaad White on behalf of the Hobbs Police Department was for the arrest of Al Rashad Rasben Craft for aggravated battery and disorderly conduct.

3. Aggravated battery consists of the unlawful touching or application of force to the person of another with the intent to injure that person or another. N.M. Stat. Ann. 1978, §30-3-5 (1963)

4. In order to establish the necessary elements for an arrest warrant, Ahmaad White would've had to assert that Craft intentionally committed the act and caused severe bodily harm.

5. Further, Detective White would have been required to support probable cause for an arrest warrant to be issued for Craft on a felony charge for aggravated battery.

6. In review of the video and additional evidence subsequently provided to me it clearly appears that Ahmaad White misrepresented facts in his affidavit in an attempt to obtain an arrest warrant.

FURTHER AFIANT SAYETH NAUGHT.

10-14-19
Date

Honorable Willie Henry

**EXHIBIT 2**

1    SUBSCRIBED, SWORN TO and ACKNOWLEDGED before me this _14th_ day of

2    October 13, 2019, by _Willie Henry_.

3

**Official Seal**
**HEATHER I. ZEBAS**
**Notary Public**
**State of New Mexico**
**My Commission Expires 6/22/21**

4

Notary Public

5

6    My commission expires: _6/22/21_

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



EXHIBIT

9

6-11

DEPOSITION OF AL-RASHAAD R. CRAFT - APRIL 23, 2019
AL-RASHAAD R. CRAFT VS. CHAD WRIGHT, ET AL - USDC NO. 2:17-CV-00469-JCH-SMV

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

AL-RASHAAD R. CRAFT,

    PLAINTIFF,

VS.    NO. 2:17-CV-00469-JCH-SMV

CHAD WRIGHT, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY;
AND AHMAD WHITE, IN HIS OFFICIAL AND INDIVIDUAL
CAPACITY,

    DEFENDANTS.

DEPOSITION OF AL-RASHAAD R. CRAFT
APRIL 23, 2019
9:04 A.M.
ZEBAS LAW FIRM
502 W. ALTO DRIVE
HOBBS, NM 88240
PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE, THIS DEPOSITION WAS:
TAKEN BY:  MR. BRYAN EVANS, ESQ.
REPORTED BY:  STARLA D. WIGGINS, RPR,CCR,CRR
STAR REPORTING SERVICE
NM #11; TX #2114; NV #629
P.O. BOX 601
LOVINGTON, NM 88260
(505) 449-7589

## Page 2

1    A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3    MR. JOSEPH ZEBAS, ESQ.
    ZEBAS LAW FIRM
4    P.O. BOX 1675
    HOBBS NM 88241
5
    MR. TIMOTHY L. WHITE, ESQ.
6    VALDEZ & WHITE LAW FIRM, LLC
    P.O. BOX 25646
7    ALBUQUERQUE, NM 87125-6546
8  FOR THE DEFENDANTS:
9    MR. BRYAN EVANS, ESQ.
    MRS. RENEE GANTERT, ESQ.
10    ATWOOD, MALONE, TURNER & SABIN, P.A.
    P.O. DRAWER 700
11    ROSWELL, NM 88202-0700
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1    I N D E X
2  WITNESS:    PAGE:
3  AL-RASHAAD R. CRAFT
4  EXAMINATION BY MR. EVANS.....................4
5  REPORTER'S CERTIFICATION OF COMPLETION PAGE....261
6  SIGNATURE PAGE................................263
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1    AL-RASHAAD R. CRAFT,
2  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
3    EXAMINATION
4  BY MR. EVANS:
5    Q.  Please state your full name.
6    A.  Al-Rashaad Rasben Craft.
7    Q.  Would you mind spelling that so we can be
8  sure we got it correct?
9    A.  Most definitely.  Capital A-l hyphen
10  R-a-s-h-a-a-d.  Rasben is R-a-s-b-e-n.  Craft is
11  C-r-a-f-t.
12    Q.  Okay.  Thank you.  Mr. Craft --
13    A.  But I go by, Rashaad.
14    Q.  Okay.  My name is Bryan Evans.  We met very
15  briefly before we got started here on the record, and I
16  represent the folks that you are suing in this lawsuit.
17  Have you ever given a deposition before?
18    A.  I have not.
19    Q.  Okay.  Have you ever testified in Court
20  before?
21    A.  I have not.
22    Q.  Okay.  I'm sure your attorneys have gone
23  over this with you at length, but I'm here today just to
24  ask you some questions about what happened in this
25  incident here in Hobbs.

1 (Pages 1 to 4)



DEPOSITION OF AL-RASHAAD R. CRAFT - APRIL 23, 2019
AL-RASHAAD R. CRAFT VS. CHAD WRIGHT, ET AL - USDC NO. 2:17-CV-00469-JCH-SMV

---

Page 197

1    A.   Yes.
2    Q.   And did you ever get to the point of getting
3    your cameras, tripod and stuff set up?
4    A.   I set up the tripod, and I believe as I was
5    setting up my camera on the tripod is when he came up.
6    Q.   As far as you know, is any part of your
7    arrest, the actual arrest on video?
8    A.   No, sir.
9    Q.   Okay.  You said when you got to the police
10   station you were put in a room, and Officer White came
11   in and started talking to you.  Tell me what was said.
12   A.   I can't recall too much of it to this day,
13   aside from him just introducing himself, and then that's
14   really it.
15   Q.   Is there any other aspect of that
16   conversation, either from him to you, or you to him that
17   you can recall?
18   A.   Just -- I just thought it was insincere him
19   not reading me my Miranda Rights, and I was like, like I
20   didn't understand that part.  I was like, what?  Like.
21   Q.   But then you asked him to do that, and he
22   did it?
23   A.   Yes.
24   Q.   At that point, after Officer White came and
25   started talking to you, did you understand that you were

---

Page 198

1    being arrested for this incident with Mrs. Stone?
2    A.   To a degree.  I made the assumption, yes,
3    because throughout the conversation, he divulged Mrs.
4    White, and really started getting into, I guess the
5    assault, and whatever aggravated, whatever.
6    Q.   Okay.  What happened then after Officer
7    White came in and talked to you?  Do you want to take a
8    break?
9    A.   No, I'm fine.  Either I was taken to another
10   holding cell, and then I think from there they fitted me
11   out, or whatever with clothing, or I don't know.
12        They took my possessions, or I don't know.
13   All of that is really dark, and I think they put me in a
14   cell after that.
15   Q.   Okay.  At the city jail?
16   A.   Yes.
17   Q.   Okay.  Were you with any other detainees in
18   the city jail?
19   A.   I think for a while.  I think I was.
20   Q.   Okay.  How long were you in the city jail?
21   A.   Until that Tuesday or Wednesday.  So from
22   Saturday to Tuesday or Wednesday.
23   Q.   Okay.
24   A.   And then I was transferred.
25   Q.   Transferred to where?

---

Page 199

1    A.   To Lovington Correctional Facility.
2    Q.   Okay.  I have looked it up here, and the
3    25th was a Saturday.
4    A.   Yes.
5    Q.   Okay.  And you are saying you were in the
6    Loving, or --
7    A.   The Hobbs.
8    Q.   -- the Hobbs City Jail until the next
9    Tuesday?
10   A.   No, no.  That upcoming Tuesday yes, sir.
11   Q.   So like the 28th?
12   A.   Yes.  The 28th and 29th.
13   Q.   Then you were transferred to the detention
14   center?
15   A.   Yes.
16   Q.   Okay.  In Lovington?
17   A.   Yes.
18   Q.   During the time that you were in the Hobbs
19   City Jail, were you, and again I understand being in
20   jail is unpleasant, but other than, given that, were you
21   in any way, otherwise mistreated?
22   A.   No.
23   Q.   Okay.
24   A.   Not that I can recall.
25   Q.   While you were in the Hobbs jail did you

---

Page 200

1    have any kind of incidents or problems, or issues?
2    Anything like that?
3    A.   No.
4    Q.   Okay.  So then you're transferred to the Lea
5    County Detention Center in Lovington, and how long were
6    you there?
7    A.   I was released on May 13th.
8    Q.   Okay.
9    A.   Of 2015.
10   Q.   There's some documentation in this case that
11   is a form, and it's entitled something like conditions
12   of release, and it's dated like April 27th or 28th.  And
13   then there's a subsequent form that's basically the same
14   form, and it's dated May 13th, or something like that, I
15   think.  You were not let go, and given your freedom as
16   of April 27th or 28th, is that your testimony?
17   A.   Yes, I was not.
18   Q.   Okay.  You were transferred as of
19   approximately that date?
20   A.   Yes, sir.  So released to another facility.
21   Q.   Okay.  How would you describe your time out
22   at the detention center?
23   A.   Horrible.
24   Q.   Why?
25   A.   I have never been arrested before in my

---

50 (Pages 197 to 200)