IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AL-RASHAAD R. CRAFT,

          Plaintiff,

vs.

CHAD WRIGHT, in his official and
individual capacities; and AHMAD
WHITE, in his official and individual
capacities,

          Defendants,

Case No.  17-CV-469-NF-KHR

---

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is a Fourth and First Amendment case regarding the arrest, detention and prosecution of Plaintiff Al-Rashaad R. Craft for alleged felony battery and disorderly conduct occurring in an incident when Mrs. Susan Stone struck him while he was recording his preaching in a public square in Hobbs, New Mexico.  Plaintiff does not, however, sue Mrs. Stone in this case.  Rather, Plaintiff sues the Hobbs Police Department officer – Detective Ahmad White – who investigated the incident and wrote a sworn Criminal Complaint to obtain a warrant for Plaintiff's arrest.  Plaintiff sues White in his individual and official capacities.  Plaintiff also sues another officer of the Hobbs Police Department, Captain Chad Wright, in his individual and official capacities for allegedly causing White to "find a reason" to arrest Plaintiff.  Defendants move for summary judgment based on

qualified immunity. CM/ECF Doc. 90. Plaintiff opposes, arguing summary judgment is inappropriate due to issues of material fact. Doc. 101. For the reasons that follow, the Court concludes Wright is entitled to qualified immunity on the individual capacity claims against him due to a lack of evidence tying him to Plaintiff's arrest, detention or prosecution. White is not entitled to summary judgment on qualified immunity for the Fourth Amendment and First Amendment claims. The official capacity claims against both White and Wright are dismissed based on Plaintiff's concession at the hearing on this motion.

I.    *Undisputed Facts*

The following facts appear undisputed except where noted.[1]  Plaintiff Al-Rashaad R. Craft is of African-American descent and Christian in religious belief. His father and grandfather were Southern Baptist preachers, and his father instilled in him the importance of ministering the word of God to all people. He believes projecting the word of God to be his obligation as a Christian.

A.    *Plaintiff's Public Preaching and the Underlying Incident with Mrs. Stone*

For parts of 2014 and 2015, Plaintiff lived in Hobbs, New Mexico while working for the U.S. Department of Energy. Doc. 38 ¶¶ 1, 2, 30. On Saturday, April 18, 2015, Plaintiff went to the Shipp Street Plaza in Hobbs, New Mexico, set up his smartphone on

---

[1] The Court's task in identifying undisputed material facts is somewhat complicated by Plaintiff's failure to respond to Defendants' statement of facts as required in Local Rule 56.1. At oral argument, Defendants asserted the Court should on this basis deem all of their stated facts as undisputed. However, Plaintiff has complied with Rule 56(c) procedures for supporting his assertions that material facts are genuinely disputed. The Court exercises its discretion to not consider Defendants' statement of facts undisputed under Local Rule 56.1.

a tripod, and began to record himself preaching.  Defendants' Ex. 1, Craft Deposition, p. 65:13-20; Plaintiff's Ex. 1 ("Craft's Recording").  Shipp Street Plaza is a public forum or public square.  Doc. 101, pp. 1-2, ¶ 1.

Plaintiff had been in Hobbs for approximately eight months, during which time he preached in public almost "every weekend, or every other weekend."  Craft Deposition, p. 33:12-24.  Plaintiff recorded his preaching and then uploaded the recordings to his YouTube channel, "Hawashinawa Ma Ri."  Craft Deposition, pp. 30:9-12; 31:4-20.

Susan Stone's husband owned a store down the block from Shipp Street Plaza. While Plaintiff was preaching on this particular Saturday, Mrs. Stone approached him. Defendants' Ex. 2 (Plaintiff's April 18, 2015 audiovideo recording, hereafter "Plaintiff's Video"), starting at 8:07; Plaintiff's Ex. 1, Craft Recording.[2]  Neither party prepared an official transcript of Plaintiff's Video.[3]  The Court has watched and listened to Plaintiff's Video, and notes it shows the following facts.

- While Plaintiff was preaching, Mrs. Stone approached Plaintiff from off-screen and started speaking loudly as he spoke.  When Plaintiff attempted to continue preaching

---

[2] It appears undisputed that Plaintiff's Ex. 1 and Defendants' Ex. 2 are unadulterated copies of Plaintiff's smartphone recordings of April 18, 2015. Defendants' exhibit is a 15-minute segment, while Plaintiff's exhibit omits approximately the first 8 minutes of that segment. For simplicity, the Court refers to Defendants' Ex. 2 as the Plaintiff's Video. Defendants assert this is the eighth of ten videos Plaintiff uploaded of his April 18, 2015 sermon to his YouTube channel at https://www.youtube.com/watch?v=0nBznwOVd9M&t=596s.  The YouTube site has additional information relating to the uploaded video (caption, view count, etc.), but neither side relies on that information for present purposes.

[3] In one of the deposition transcripts, the court reporter transcribed most of the interaction between Plaintiff and Mrs. Stone as Plaintiff's counsel played the video in the deposition, but could not catch some of the words.

and reading out loud from the Bible he was holding open in his hands, Mrs. Stone repeatedly yelled over Plaintiff's voice, in somewhat slurred speech, "ye goddamn nut," "you goddamn nut," and turned Plaintiff's words against him ("you will be destroyed"), etc., while waving something that looks like a lighter-holder between him and his camera, and moving around him. Mrs. Stone asserted her right to be on public property too. At about one minute and twelve seconds of Mrs. Stone's intervention, the camera captures from Plaintiff's left-forward, Mrs. Stone's hand bringing her lighter-case up under the Bible and pushing it up and back into Plaintiff's face while he was reading out loud from it.

- Plaintiff then turned and took a step off-camera to his forward-left, the direction from which Mrs. Stone's hand had just come. Simultaneous with Plaintiff's movement, he yelled "Watch out! Don't you ever touch me again!" Plaintiff immediately stepped back to where he had been, in front of his camera, looking still to his forward-left off-screen. Plaintiff's Ex. 1, 1:12-17. Later in the recording, Plaintiff tells a police officer that Mrs. Stone pushed him and then he pushed her. A man who later identified himself to police as Israel Loya-Lopez told police that he helped Mrs. Stone to get up from the ground.

- Approximately two seconds later, Mrs. Stone can be heard saying she was "going to get her husband right now." *Id.,* 1:19-21. Plaintiff turned to his right, seemed to point to onlooking bystanders in that direction, and said, "And I'm glad everyone saw that." *Id.,* 1:22-26.

- Meanwhile, a man later identified to be Mrs. Stone's husband, Mark Stone, approached

4

from off-screen, confronted Plaintiff about knocking down Mrs. Stone, and although keeping his hands in his pockets, physically and verbally taunted Plaintiff to put his hands on him, also motioning to someone off-camera. Mrs. Stone meanwhile circled closer to Plaintiff in the background, yelling at him "How do you think I fell down?" *Id.* 1:26 and following. Plaintiff tells Mr. Stone to call the police and do what he has to. Mr. Stone continued to approach closer, and Plaintiff turned the camera to record Mr. and Mrs. Stone, referring to them as demons. In the process, this showed a third man was standing near to Mr. Stone, watching Plaintiff. Plaintiff removed his tunic[4] and further responded to Mr. Stone, saying to the effect any woman who puts her hands on him (like Mrs. Stone did) would feel the pain of Yahawa-shirdi-baba-shad.[5]

- In response to either Mr. Stone or Mr. Loya-Lopez stating that you don't knock down a woman, Plaintiff said "then keep your hands off me." Mr. Stone taunted Plaintiff to knock him down. When Mr. Stone advanced to within inches of his face, Plaintiff asked Mr. Stone to back up, to which he said "No. Put your hand on me," and did not move away, while Mrs. Stone continued to shake her lighter-case at Plaintiff and yell at him. Finally, Plaintiff put his tunic back on and turned back to his phone camera. Mr. Stone moved close in and then said "You're a piece of sh*t, you know that. Yeah, you're a piece of sh*t." Plaintiff's Ex. 1, 3:30. At about 3:34, Mrs. Stone in the background

---

[4] In deposition, Plaintiff testified he felt these people wanted to provoke him into a fight, and he did not want his tunic to be soiled. Craft Deposition, p. 86:3-14.

[5] In deposition, Plaintiff explained Yahowa or Yahawa is the Hebrew name by which he refers to his God, and Yahawa...shad or Yahawah Bahasham Yahashai is the name by which he refers to the son of God. *Id.*, pp. 127:17-25, 128:1-9; 129:4-8.

touched the back of her head and said "my f*ing head is hurting" and told Plaintiff he should "look on your camera and see where I was touching you," *i.e.,* contending she had not touched Plaintiff.

- At that point, Plaintiff said Mrs. Stone was drunk and would go to jail for public intoxication, to which Mrs. Stone replied that Plaintiff would go to jail, "you mother f*r." Plaintiff resumed reading from his Bible and expounded on these events as examples of the problems with the world he had been discussing before the incident.

Defendants say Plaintiff pushed Mrs. Stone with both hands "to the ground." Doc. 90, p. 4 ¶ 7 (citing Plaintiff's Video, 9:14 to 9:17). Plaintiff says he "pushed the wom[a]n away, and she lost her balance and fell." Doc. 101, p. 3, ¶ 6.

B.   *Initial Hobbs Police Department Response*

At that point, the Stones retreated a space away. Someone called the Hobbs Police Department, and Officers Brandon Ellis and Michael Thomas responded to the scene. Defendants' Ex. 3, Incident Report by Brandon Ellis ("Incident Report," p. 4; Deposition of Michael Thomas at pp. 14:7-10, 16:8-10). Officer Ellis took the lead and spoke to Mrs. Stone first.

The parties disagree regarding many details of what the witnesses reported to Officer Ellis. Defendants rely largely on Ellis's summary of the conversations in his incident report and White's rendition of that summary in the Criminal Complaint, along with White's summaries of his own conversations with Loya-Lopez and the Stones. Plaintiff instead relies primarily on the officers' audiorecordings, particularly Ellis's Audiorecording. Plaintiff's Ex. 2 ("Ellis's Audiorecording"). That recording reflects

Officer Ellis interviewed Mr. and Mrs. Stone together. A man's voice that sounds like Mr. Stone's (from the Plaintiff's Video) answered Ellis initially, saying "He's filming himself. He's here every week." The same voice reported that he did not see the whole interaction between Plaintiff and Mrs. Stone, but a "close friend" did. The same voice asserts Plaintiff was trying to "instigate" and becoming more "belligerent" all the time. *Id.,* approximately 1:20. Later, the same male voice can be heard asserting Plaintiff was "preaching down with the white people." *Id.,* approximately 2:05-20.

Defendants claim Mrs. Stone told Ellis that she was waving her lighter in front of Mr. Craft's camera and telling him she had freedom of speech too when he pushed her with both hands to the ground. Plaintiff asserts no injuries were reported at the time, but in Ellis's Audiorecording Mrs. Stone reported she had pain in her rear, back and head. Mrs. Stone told Ellis she did not want an ambulance.

Ellis then interviewed Plaintiff where he was continuing to record himself preaching. Plaintiff's Ex. A Pt. II (notice of lodging, January 4, 2018) at approximately 4:00-8:00.[6] Plaintiff told Ellis he had been preaching or prophesying when Mrs. Stone approached him, waved her lighter in front of his camera, and "talked smack" to him; Plaintiff said he ignored Ms. Stone because she wasn't touching him; but after about three minutes of this, Mrs. Stone pushed him and he pushed her back. *Id.* Ellis included this information in his incident report, and White included it in his Criminal Complaint.

---

[6] Plaintiff cites his Ex. 1 for the recording of his interactions with Officer Ellis, but that excerpt ends before the police arrive, as does Defendants' Ex. 2. However, Plaintiff's operative complaint (Doc. 38 ¶ 22) incorporates the 15-minute segment that begins where Plaintiff's Ex. 1 ends. *See* Doc. 35, Notice of Lodging, "Exhibit A Part II" therein.

After Ellis went back to speak again with the other witnesses, Plaintiff stated loudly in their direction that the entire incident was on video. Plaintiff's Ex. A Pt. II at 9:55-10:08. Plaintiff's reference to his video is also audible in Ellis's Audiorecording.

When Ellis returned to the Stones he asked for the witness whom Mr. Stone mentioned earlier. He then spoke with Mr. Loya-Lopez, apparently the person to whom Mr. Stone earlier referred to as his close friend. Mr. Loya-Lopez reported witnessing the incident. Ellis's Audiorecording at approximately 7:10; Incident Report, p. 5; Warrant and Criminal Complaint, p. 5. Mr. Loya-Lopez told Ellis that Mrs. Stone walked over to Plaintiff and "started messing with him [inaudible] he was preaching," waved her lighter in front of Plaintiff's camera, and Plaintiff pushed her. Loya-Lopez said that Mrs. Stone had never touched Plaintiff. Ellis's Audiorecording; Incident Report, p. 5; Warrant and Criminal Complaint, p. 5. Mr. Loya-Lopez compared the force of the push to what he would use if a 300-pound man was trying to give him problems. Ellis's Audiorecording at approximately 7:30.

Ellis did not attempt to seize, view, obtain, or otherwise access any of Plaintiff's video recordings because he did not think about it at the time. Defendants' Ex. 5, Deposition of Brandon Ellis, 51:23—52:3.

Officers Ellis and Thomas found no probable cause to make an arrest. They concluded the incident involved a misdemeanor battery, conduct for which they cannot arrest a person unless it occurred in the officers' presence. Plaintiff's Ex. 4, Deposition of Michael Thomas, pp. 23-25:5; Ellis's Audiorecording at approximately 9:20-10:25. Ellis told both parties that a report would be written up and that they could contact the District

Attorney if they wanted to pursue charges.  Plaintiff was undecided.  Mrs. Stone wanted to pursue charges, and Mr. Stone demanded the presence of a supervisor.  Plaintiff's Response, Doc. 101, p. 4, ¶ 12 (citing Ellis's Audiorecording at 9:24).

Officer Ellis called his office on his car radio to let them know people might be calling because there were several people upset that they were not arresting Plaintiff. Plaintiff asserts Ellis spoke at this time to his supervisor (Sergeant Timothy McEachern) and that McEachern advised Ellis they were attempting to find a way to get Craft off the street.[7]  Officer Ellis later testified in his deposition that Sergeant McEachern told him that "Chad Wright had said we needed to find a reason to arrest him."  Ellis Deposition, pp. 15:17-16:24.[8]

After watching Plaintiff's recording in his deposition, McEachern testified that the individual who should have been arrested was Mrs. Stone, not Craft.  Plaintiff's Ex. 3, Deposition of Timothy McEachern, pp. 41:20-42:8.  McEachern further testified that the altercation between Plaintiff and Mrs. Stone would be considered a misdemeanor battery and therefore no arrest should have been made, and there was no reason to take or go into Craft's phone.  *Id.*, p. 44:5-15.  In the years Officer Ellis was with the Hobbs Police Department, he had never seen an individual get arrested for a misdemeanor battery that occurred outside of an officer's presence.  Ellis Deposition, pp. 23:25-24:3.

---

[7] Plaintiff cites the Ellis's Audiorecording at 16:48.  However, in the Court's review, McEachern is not audible in the recording.

[8] In McEachern's deposition, he testified that Wright (then a Lieutenant) was his immediate supervisor at the time, but it appears he was not asked whether Wright said this to him or not.  It also appears Wright was not asked this question in his deposition.

C.    *Detective White's Investigation*

On April 19, 2015, the day after the altercation, Officer Ellis's supervisor, Walter Coburn, removed him from the case and advised him he was to not contact any witnesses or victims in the case.  Ellis Deposition, p. 62:18-24.  That same day, Coburn assigned Defendant White to the case.  Warrant and Criminal Complaint, p. 5; Defendants' Ex. 6, Deposition of Ahmaad White, pp. 25:11—26:3.  White knew Officer Ellis had responded to the call, but did not know until his deposition that Officer Thomas had also been there and completed an incident report.  *Id.* at pp. 60:21-61:1.

On April 19, White contacted Israel Loya-Lopez at his house and interviewed him about the incident.  Warrant and Criminal Complaint, p. 6.  Mr. Loya-Lopez reported that Plaintiff pushed Mrs. Stone with the force that he would use to push a 300-pound man. Warrant and Criminal Complaint, p. 6; Defendants' Ex. 7, Detective White's Audiorecording of Interview of Israel Loya-Lopez.

White then went to the home of Mr. and Mrs. Stone.  Warrant and Criminal Complaint, p. 6.  Mrs. Stone told White that she waved her lighter in front of Plaintiff's camera, he pushed her, and she hit her head.  *White's Audiorecording with the Stones.* Warrant and Criminal Complaint, p. 7.  Mrs. Stone said she was still in pain.  On White's leading questions of whether she was incapacitated, unable to move around, to perform her daily duties, or sit up without assistance, Mrs. Stone agreed with all of those statements. White's Audiorecording with the Stones.  White took photos of bruises on Mrs. Stone's right arm and a bump on the back of her head.  Defendants' Ex. 8 (photos).

The only address for Plaintiff that Officer Ellis obtained was the Houston address on Plaintiff's driver's license.  Incident Report, p. 1.  As such, White did not know Plaintiff's address in Hobbs prior to arresting him.  However, Officer Ellis did obtain a telephone number from Plaintiff. *Id*.  White did not try to contact Plaintiff before arresting him. White Deposition, pp. 39:10-40:15.

D.    *Warrant Application, Arrest and Subsequent Prosecution*

After interviewing Mr. Loya-Lopez and the Stones, Defendant White conferred with the District Attorney, who agreed that Plaintiff should be charged with misdemeanor battery and disorderly conduct.  Criminal Complaint, p. 7.

A few days later, on April 23rd, Mr. Stone contacted Defendant White to report that Mrs. Stone's pain was increasing, she was acting verbally aggressive, she was confused and experiencing mood swings.  Criminal Complaint, p. 7.  This conversation is not in the record, other than White's summary of it in the Criminal Complaint.  According to White's summary in the Criminal Complaint, Mr. Stone reported that he took Mrs. Stone back to the hospital where a doctor diagnosed Mrs. Stone as having sustained a severe concussion. *Id.*, p. 8. In his response brief, Plaintiff did not dispute that Mr. Stone made these assertions to White, so the Court takes it as undisputed that Mr. Stone made them.

Upon receiving this news, White contacted the DA again.  They agreed Plaintiff should be charged with felony aggravated battery and disorderly conduct, a petty misdemeanor.  Criminal Complaint, p. 8.  White then filed the Criminal Complaint dated April 23, 2015. The state court order dismissing the charges recites that the state filed charges on April 23, 2015.  Defendants' Ex. 9, p. 1.

For purposes other than the summary judgment motion, White contends his affidavit accurately conveys what Mrs. Stone, Mr. Stone and Mr. Loya-Lopez reported to either him or Ellis. Plaintiff contends to the contrary, White fabricated numerous assertions in his Criminal Complaint affidavit, particularly in claiming Plaintiff's preaching included offensive comments and language, and that White knowingly or recklessly did not attempt to view the Plaintiff's Video before filing the complaint requesting an arrest warrant. A state court magistrate judge for Lea County, the Honorable Willie Henry, approved the warrant application on April 23, 2015. Warrant and Criminal Complaint generally, and p. 1.

Two days later (Saturday, April 25, 2015), Plaintiff went to the same location to preach again. Upon setting up his tripod, he was immediately detained by White with several other Hobbs police officers in the area as well. They transported Plaintiff to the local city jail, where he was detained for between four and five days, and he was later transferred to the Lea County Detention Center where he apparently remained for fourteen or fifteen days. Craft Deposition, pp. 198:6-200:7. He was charged with third-degree felony aggravated battery and disorderly conduct (a petty misdemeanor), initially required to post a cash bond of $11,000, and asserts he spent 19 days in jail. Doc. 101, p. 6, ¶ 24. According to Plaintiff, this was the first time he had ever been arrested or charged with a crime. Craft Deposition, pp. 200:21-201:1.

On December 13, 2016, the state court dismissed the charges against Plaintiff because the prosecution failed to comply with New Mexico's speedy trial requirements.

Defendants' Ex. 9, State Court Order granting Craft's motion to dismiss.  The state court found:

> This is a simple case in which a delay of longer than 12 months is presumptively prejudicial which triggers the *Barker v. Wingo* [407 U.S. 514 (1972)] factors.  The State did not respond to Defendant's motion to dismiss. The length of the delay from Defendant's arraignment to his scheduled trial was 20 months, 14 months of which were attributable to the State, 6 months to Defendant. (See Defendant's Motion attributing delay which was not contested by the State)  The reasons for the delay weigh moderately against the State. The delays were not deliberate, but administrative or neutral. Defendant asserted his right to speedy trial in May of 2015 and also when the State requested two ... continuances.

*Id.,* ¶¶ 8-12 (paragraph breaks omitted).  Four months later, Plaintiff brought this action.

## II.    *Summary Judgment Standards*

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard requires more than the "mere existence of some alleged factual dispute between the parties." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986).  Rather, it requires "there be no genuine issue of material fact." *Id.*  A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248.  "Summary judgment is inappropriate where there is a genuine dispute over a material fact, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Roberts v. Jackson Hole Mountain Resort Corp.,* 884 F.3d 967, 972 (10th Cir. 2018) (quoting *Anderson,* 477 U.S. at 248).

On a motion for summary judgment, "'we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party,

without making credibility determinations or weighing the evidence.'" *Roberts,* 884 F.3d at 971, n. 3.  Initially, the moving party carries the burden of proving the nonexistence of a genuine dispute of material fact.  *Am. Mech'l Solutions, L.L.C. v. Northland Process Piping, Inc.,* 184 F. Supp. 3d 1030, 1052 (D.N.M. 2016).  The moving party satisfies this burden by "either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.*; *see* Fed. R. Civ. P. 56(c)(1)(A)–(B).  Once the burden is satisfied, "the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute." *Tolman,* 108 F. Supp. 3d at 1162–63 (citing *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

> There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In *Scott v. Harris*, 550 U.S. 372 … (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

*American Mechanical,* 184 F. Supp. 3d at 1055 (quoting *Scott,* 550 U.S. at 378–81).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record [such as a video recording], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380-81.

14

III.    *Plaintiff's Individual Capacity Claims*

   A.    *Qualified Immunity*

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons,* 139 S. Ct. 500, 503, 202 L. Ed. 2d 455 (2019) (*per curiam*) (internal quotation marks omitted). The U.S. Supreme Court "has repeatedly told courts ... not to define clearly established law at a high level of generality." *Id.*

> The qualified immunity rule seeks a proper balance between two competing interests. On one hand, damages suits may offer the only realistic avenue for vindication of constitutional guarantees. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. As one means to accommodate these two objectives, the Court has held that Government officials are entitled to qualified immunity with respect to discretionary functions performed in their official capacities. The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions.

*Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017) (internal quotation marks and citations omitted). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1867 (internal quotation marks omitted, quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotation marks omitted).

> Because qualified immunity is an immunity from suit ... it is effectively lost if a case is erroneously permitted to go to trial. ... Accordingly, we

> repeatedly have stressed the importance of resolving immunity questions at
> the earliest possible stage in litigation.

*Id.* at 231–32 (internal citations and quotation marks omitted).

> In resolving questions of qualified immunity at summary judgment, courts
> engage in a two-pronged inquiry. The first asks whether the facts, taken in
> the light most favorable to the party asserting the injury, show the officer's
> conduct violated a federal right. * * * The second prong of the qualified-
> immunity analysis asks whether the right in question was clearly established
> at the time of the violation. ...

> Courts have discretion to decide the order in which to engage these two
> prongs. But under either prong, courts may not resolve genuine disputes of
> fact in favor of the party seeking summary judgment.

*Tolan v. Cotton,* 572 U.S. 650, 655-56 (2014) *(per curiam)* (internal citations and quotation

marks omitted). "This is a 'heavy, two-part burden' that the plaintiff must meet." *Puller*

*v. Baca,* 781 F.3d 1190, 1196 (10th Cir. 2015). "When a plaintiff meets this heavy burden,

the burden shifts back to the defendant to prove that there are no genuine disputes of

material fact and that he is entitled to judgment as a matter of law." *Id.*

"Specificity [of the factual context for qualified immunity analysis] is especially

important in the Fourth Amendment context, where the Court has recognized that it is

sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply

to the factual situation the officer confronts." *Emmons*, 139 S. Ct. at 503 (internal quotation

marks omitted).

> While there does not have to be a case directly on point, existing precedent
> must place the lawfulness of the particular action beyond debate.... Of course,
> there can be the rare obvious case, where the unlawfulness of the officer's
> conduct is sufficiently clear even though existing precedent does not address
> similar circumstances.

*Id.* at 504 (internal quotation marks omitted).

16

"In cases alleging unreasonable searches or seizures, we have instructed that courts should define the clearly established right at issue on the basis of the specific context of the case. Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 572 U.S. at 657 (internal citations and quotation marks omitted). Thus "[w]e start by defining the circumstances with which the officers were confronted." *D.C. v. Wesby*, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (internal quotation marks omitted).

## B.    *Defendant Wright*

The Court first addresses the claims as to Defendant Captain Wright in his individual capacity. Plaintiff asserts Wright directly and knowingly participated in the violation of Plaintiff's Fourth and First Amendment rights.[9] However, the only fact by which Plaintiff would tie Wright to Plaintiff's arrest, detention and prosecution is that Sergeant McEachern apparently told Ellis that Wright had told McEachern they need to find a reason to arrest Plaintiff. Plaintiff cites Ellis's Audiorecording and deposition. As noted, in the Court's review McEachern is not audible in the Audiorecording.[10] Plaintiff is thus relying on double hearsay – Plaintiff asserts the truth of what McEachern told Ellis- - that Wright had told McEachern to find a reason to arrest Plaintiff.

---

[9] Although it appears earlier in the case Plaintiff argued so-called supervisory liability (*see Dodds v. Richardson*, 614 F.3d 1185, 1199-1200 (10th Cir. 2010); *Ashcroft v. Iqbal*, 128 S. Ct. 2931 (2008)) as to Wright, his current pleading omits all allegations that Wright created a policy or was deliberately indifferent to training or supervising.

[10] Ellis can be heard telling witnesses that the lieutenants are working on it, to see if they could find a municipal code etc.

In general, the party opposing summary judgment does not have to present evidence in a form admissible at trial, so long as the content or substance is admissible. *Tesone v. Empire Mktg. Strategies,* No. 19-1026, 2019 WL 5850395, at \*15 (10th Cir. Nov. 8, 2019) (citing *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). Defendants objected at the hearing to this double-hearsay statement, and Plaintiff argued admission of a party opponent under Federal Rule of Evidence 801(d)(2). Assuming a statement made before the person is a party in litigation can qualify as a party-opponent admission,[11] this would address the first hearsay level – Wright's reported out of court statement to McEachern – but it does not address McEachern's recounting it to Ellis, and Ellis's recounting in deposition. Under Rule 56(c)(2), it appears this fact cannot be presented in a form admissible at trial. The Court accordingly does not consider the double hearsay statement as creating a material fact dispute as to Wright.

But regardless, assuming Wright did make this statement, Ellis determined there was no probable cause and did not arrest Plaintiff. Plaintiff does not point to any documents or deposition testimony connecting Wright to the case being assigned to White. Wright testified in deposition that he did not speak to White about the incident prior to Plaintiff's arrest. Defendants' Ex. 10, Deposition of Chad Wright, p. 134:7-13. Defendant Wright did not have any involvement in assigning this case to Defendant White, and he did

---

[11] "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." *United States v. Ganadonegro,* 854 F. Supp. 2d 1088, 1101–02 (D.N.M. 2012) (quoting *Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643, 667 (10th Cir. 2006)).

not speak to White about it until after Plaintiff's arrest. Wright did not have any role in the subsequent investigation or decision to seek a warrant for Plaintiff's arrest. Wright Deposition, pp. 119:13-17, 125:7-20, 134:7-13, 135:8-10. In his response, Plaintiff also did not point to any evidence Wright spoke with or directed White (or anyone else involved) about Plaintiff's detention or prosecution. In his deposition, Plaintiff said he "just knew" Wright was involved, but he did not point to any evidence. Craft Deposition, pp. 182:18–184:7. Wright is entitled to qualified immunity on the individual capacity claims against him for lack of evidence he was involved in any constitutional violations.

### C.    Fourth Amendment False Arrest

Plaintiff brings a Fourth Amendment claim for false arrest[12] against White.

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because arrests are "seizures" of "persons," they must be reasonable under the circumstances.

*Wesby*, 138 S. Ct. at 585. "An arrest warrant must be supported by probable cause to comply with the Fourth Amendment." *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the

---

[12] Plaintiff was arrested on a warrant. Because an arrest warrant is the initiation of legal process, his Fourth Amendment claim that the warrant lacked probable cause is one for malicious prosecution, not false arrest. *See, e.g., Wilkins v. DeReyes*, 528 F.3d 790, 798-99 (10th Cir. 2008) (distinguishing the two claims based on whether the arrest was by warrant or not). However, both sides assume the arrest portion of Plaintiff's claim is a false arrest claim, as did Judge Herrera in the Order on Motion to Dismiss, Doc. 47. The distinction does not appear to matter for purposes of Plaintiff's Fourth Amendment claim(s), but as will be seen below, separate lines of cases have developed under the First Amendment for retaliatory arrest vs. retaliatory prosecution.

crime." *Id.* (quoting *Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir. 1996)). It requires that at the moment of the arrest, "the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the arrestee had committed an offense." Doc. 47, Memorandum Opinion and Order denying Defendants' motion to dismiss, September 26, 2018 ("Order on Motion to Dismiss"), p. 4 (citing *Hunter v. Bryant,* 502 U.S. 224, 228 (1991)).

> Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar.

*Wesby,* 138 S. Ct. at 586 (internal citations and quotation marks omitted). Plaintiff asserts probable cause was lacking for White's Criminal Complaint and his arrest.

Although White obtained a warrant to arrest Plaintiff, Plaintiff asserts White obtained the warrant by false statements and knowing or reckless omissions.

> Affiants seeking arrest warrants violate the Fourth Amendment when they knowingly, or with reckless disregard for the truth, include false statements in an affidavit, or knowingly or recklessly omit from it information which, if included, would vitiate probable cause. ... In such a situation, we measure probable cause by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes probable cause for the warrant.

*Puller v. Baca,* 781 F.3d 1190, 1197 (10th Cir. 2015) (citing *Wolford,* 78 F.3d at 489). Omissions are material if they would vitiate probable cause. Order on Motion to Dismiss, p. 5 (citing *Stewart v. Donges,* 915 F.2d 572, 582, n. 13 (10th Cir. 1990)).

20

White's Criminal Complaint alleges Plaintiff committed third-degree felony aggravated battery and disorderly conduct under New Mexico law. Felony aggravated battery is defined as follows:

> A. Aggravated battery consists of the unlawful touching or application of force to the person of another with intent to injure that person or another.
> . . .
> C. Whoever commits aggravated battery inflicting great bodily harm or does so with a deadly weapon or does so in any manner whereby great bodily harm or death can be inflicted is guilty of a third degree felony.

N.M.S.A. § 30-3-5. Disorderly conduct is defined in relevant part as "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." N.M.S.A. § 30-20-1(A). It is a petty misdemeanor. *Id.*; *see also* Warrant and Criminal Complaint, p.1. It has two elements: the conduct itself and the tendency of the conduct to disturb the peace. *State v. Salas*, 986 P.2d 482, 486 (N.M. Ct. App. 1999). Conduct which tends to disturb the peace includes conduct "which, by causing consternation and alarm, disturbs the peace and quiet of the community." *State v. Doe*, 583 P.2d 464, 466 (N.M. 1978). *See also Buck v. City of Albuquerque*, 549 F.3d 1269, 1284 (10th Cir. 2008).

Plaintiff asserts White's Criminal Complaint falsely alleges numerous facts. Indeed, Plaintiff asserts *most* of the facts White represented are false. Doc. 101, p. 9. First, White alleged Susan Stone or Mr. Loya-Lopez told him or Ellis that Plaintiff made racially offensive comments, specifically alleging he had said "all white people need to be murdered," "the black man needs to rise up and kill all of the white people," "white people and white women should be murdered," and "black people should rise up and make

21

Mexicans their slaves," "women should be beaten into submission and how white people should all be murdered so the black race could dominate everything." Criminal Complaint, pp. 4-6. Second, White alleged Stone told him Plaintiff used profanity in front of children. *Id.,* p. 4. Third, White alleged Plaintiff was arguing with Stone and pushed Stone without prior physical contact initiated by Stone. *Id.* Fourth, White alleged that EMS responded to the scene. *Id.* For purposes of the case overall, White disputes any of his assertions in the Criminal Complaint were false. However, for purposes of summary judgment he does not contend the truth of these assertions.

Plaintiff further asserts White knowingly or recklessly omitted from the Criminal Complaint what Plaintiff's Video clearly showed: Mrs. Stone approached Plaintiff to interfere with his preaching; Plaintiff did not argue with Stone, but rather allowed her to yell over him and wave her lighter between him and his smartphone as he continued to read from his Bible; Stone's speech was slurred; Stone used profanity and Plaintiff did not; Stone made the first physical contact in striking Plaintiff's face with his Bible; Plaintiff reacted by turning toward Stone off-screen and (as he admits on the recording and in his Complaint), he pushed her away. However, the video further shows Stone was up and walking moments after Plaintiff pushed her; she in fact resumed yelling at him as Mr. Stone tried to provoke Plaintiff as well; and EMS was not called to the scene because Stone told Ellis she did not need an ambulance. For purposes of summary judgment, White does not dispute the Plaintiff's Video shows all of those facts.

Rather, he argues he is nonetheless entitled to qualified immunity on this claim because even after removing all the statements Plaintiff asserts are false, and adding all

omitted facts that Plaintiff asserts are material, there was still probable cause to arrest Plaintiff for felony aggravated battery and disorderly conduct.   White argues Plaintiff admitted to pushing Stone; White did not have to consider whether Plaintiff acted in self-defense; Mrs. Stone agreed with White that she was incapacitated the next day; Mr. Stone told White that Mrs. Stone was diagnosed with a severe concussion five days after the incident; Loya-Lopez said Plaintiff used a high amount of force; and regardless of how forceful or not, Plaintiff's pushing Mrs. Stone was by definition "violent" conduct for purposes of disorderly conduct, and it tended to disturb the peace.   Thus White argues Plaintiff's admission that he pushed Stone gave all the probable cause required, and there was no need to ask for or review the Plaintiff's Video before the arrest.   The Court is not persuaded, as follows.

> 1.    *Reasonable Investigation When There Is a Known, Accessible Video of an Alleged Crime*

First and foremost, White assumes it is reasonable for officers to ignore a known video of an alleged crime and rely instead only on witness statements.  In *Baptiste v. J.C. Penney Co.,* 147 F.3d 1252 (10th Cir. 1998), the Tenth Circuit addressed whether officers must review a video of an alleged crime before making an arrest.  In that case, the plaintiff brought a Fourth Amendment false arrest claim after police officers arrested her based on a store's allegation that she shoplifted.

> The security guards' allegations were based solely on the conduct of Ms. Baptiste which was memorialized in its entirety on the videotape.  The officers viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause.  It was therefore not reasonable for the officers to rely on the security guards' allegations.  Officers may not rely solely on a security guard's allegations when the officers have before

23

them an exact replication of all the information on which the guard's allegations are based.

*Id.* at 1257. In a footnote, the court added:

> *Absent exceptional circumstances ... when a videotape of the conduct at issue is both known and readily accessible to an officer investigating an alleged crime, the officer must view the videotape so as to avoid improperly delegating the officer's duty to determine probable cause. ...* While officers are not required to conduct full investigations before making an arrest, an officer may not ignore a videotape which records the alleged criminal acts.

*Id.,* n.8 (emphasis added).

*Baptiste* put officers on notice that it is unreasonable to ignore a known, available video of an alleged crime before determining probable cause exists for an arrest, at least in non-emergency circumstances where there is only one known video. "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *Cortez v. McCauley,* 478 F.3d 1108, 1116 (10th Cir. 2007) (citing *Baptiste*). Of course, in *Baptiste* the officers *did* review the video in question, knew it was the only basis for the guards' allegations of shoplifting, and arrested the plaintiff despite the video showing a lack of probable cause.

On the unique facts of this case, Plaintiff at least shows a material fact dispute whether White lacked probable cause under *Baptiste* in ignoring Plaintiff's video before seeking the warrant for his arrest. Again, probable cause is defined as "the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the arrestee had committed an offense." White does not dispute that he knew Plaintiff video-recorded his preaching on the day in question, including the incident with Mrs. Stone, yet he did not

attempt to obtain or review the video before arresting Plaintiff.[13]  There was no emergency;

White does not contend Plaintiff posed a risk to anyone's safety while White conducted his

investigation.  White did not even believe Plaintiff committed more than a misdemeanor

battery until five days after the incident.  It was not reasonable for White to take only the

statements of the initial aggressor Mrs. Stone, her husband Mr. Stone – and Mr. Stone's

"close friend" Mr. Loya-Lopez – regarding the incident for five days, and meanwhile

ignore Plaintiff's known video of the alleged crime.

White argues he did not have Plaintiff's address in Hobbs, and White testified in

deposition that Plaintiff had "disappeared."  However, Ellis's Audiorecording reflects that

when Ellis asked Plaintiff what brought him to Hobbs, Plaintiff told Ellis he worked there.

White does not dispute he knew the witnesses had said Plaintiff preached in the same place

every week.  Indeed, this was how White found the Plaintiff to arrest him – he went to the

same place the next Saturday.  Plaintiff was setting up his phone on the tripod when White

and other officers arrested him, and White neither asked Plaintiff to show him the video

nor sought to seize the phone (pursuant to a search warrant White obtained, White

Deposition, pp. 77-78) before arresting him.

Nor does White address the fact that Ellis's incident report included the phone

number that Plaintiff gave him when requested (Defendants' Ex. 3, p. 1), yet in the seven

---

[13] Officer Ellis did not ask to see, copy or access the video recording – but Ellis also concluded there was no probable cause to arrest Plaintiff.  Ellis's then-supervisor Sergeant McEachern testified that given the alleged offense was only a misdemeanor occurring outside the presence of officers, it would not be necessary for an officer to ask for Plaintiff's phone or the video recording – such misdemeanors are not offenses for which an officer can make a warrantless arrest.

days he was on the case before arresting Plaintiff, White never tried to call him.[14]   Again,

in Ellis's Audiorecording, Plaintiff can clearly be heard yelling to the officers that it was

all on video.   White knew or reasonably should have known that Plaintiff was likely to

provide the video voluntarily because he considered it exculpatory.   Officers are not

required to pursue every avenue of investigation before determining probable cause to

arrest, but footnote 8 of *Baptiste* is plain: an officer who ignores a known, readily accessible

video of an alleged crime before determining probable cause to arrest improperly delegates

his duty to investigate.   There is at least a material fact dispute whether a prudent person

in these circumstances would seek (or execute) an arrest warrant against Plaintiff without

first attempting to view his video of the alleged crime, and thus whether White failed to

conduct a reasonable investigation before seeking and executing the warrant for Plaintiff's

arrest.

> 2.   *An Ignored Video Vitiating Probable Cause for Only a Felony, Not Lesser-Included Charges*

White argues it is nonetheless irrelevant that he did not seek out the Plaintiff's Video

because the video does not negate probable cause for either one or both of the charges.   In

general, an omission of material fact from a criminal complaint only supports a Fourth

Amendment claim if it would vitiate probable cause.   *Puller*, 781 F.3d at 1197.   But White

is incorrect in this case for several reasons.   First and foremost, footnote 8 of *Baptiste*

overrides the general rule for the specific facts shown here.   Regardless whether Plaintiff's

---

[14] White also did not look on YouTube or other online video venues (White Deposition, p. 39:5-9), although Plaintiff also does not show it is likely White could have found Plaintiff's video without already knowing the unusual name of his YouTube channel.

Video vitiates probable cause for either or both charges, there is a fact dispute whether White conducted a reasonable investigation because he did not attempt to obtain Plaintiff's video.

Secondly, assuming for argument's sake that *Baptiste* would only hold officers liable for failing to view a video of an alleged crime if it vitiates probable cause, White assumes Plaintiff's video would only be relevant to self-defense, and self-defense is irrelevant for probable cause.[15]  Plaintiff responds that even if true in general, it was not true here because White "was aware that a self-defense claim existed and he went out of his way to fabricate evidence in order to mislead the court into issuing an arrest warrant for aggravated battery." Doc. 101, p. 10.  White replies that the video does not conclusively establish self-defense anyway.[16]

---

[15] White did include in the Criminal Complaint Plaintiff's statement to Ellis that he pushed Stone only after she pushed him.  But in New Mexico law, the use of nondeadly force in self-defense requires that Plaintiff used "an amount of force that [he] believed was reasonable and necessary to prevent the bodily harm" that he feared Mrs. Stone would do. NMRA, Crim. UJI 14-5181. It also requires, assuming he caused great bodily harm, that the amount of force he used "ordinarily would not create a substantial risk of great bodily harm." *Id*. The prosecution has the burden to prove the accused was not acting in self-defense. Order on Motion to Dismiss, p. 6 (citing NMRA, Crim. UJI 14-5183); *see also Sanchez v. Labate*, 564 F. App'x 371, 373–74 (10th Cir. 2014). But "this burden on the State does not arise in pretrial proceedings."  *Id*. at 374.  "New Mexico law … suggests that the officers had no duty to consider a claim of self-defense in deciding whether they had probable cause." *Id*.

[16] In the Order on Motion to Dismiss, Judge Herrera found the video showed Plaintiff acted in self-defense.  Doc. 47, p. 8.  However, that order also had to assume the truth of Plaintiff's allegation that he acted in self-defense. Mrs. Stone was a woman quite a bit shorter, smaller, and older than Plaintiff.  Plaintiff acknowledged he was the more physically dominant of the two. Craft Depo., p. 170:9-14. Because the push occurs off-screen, the video does not conclusively establish Plaintiff used only the amount of force he reasonably believed necessary to stop Mrs. Stone from striking him again.

The Court does not reach whether self-defense is irrelevant to probable cause.[17] Even assuming self-defense was irrelevant here, Plaintiff's video was nonetheless highly material to the elements of felony battery and thus to White's decision to seek the arrest warrant. As noted, felony battery requires an intent to injure and a resulting "great bodily harm." "Great bodily harm" is defined as "an injury to the person which creates a high probability of death; or which causes serious disfigurement; or which results in permanent or protracted loss or impairment of the function of any member or organ of the body." N.M.S.A. § 30-1-12(A). White appears to contend that even assuming all the facts shown in the Plaintiff's video, he had probable cause to believe Plaintiff intended to injure Mrs. Stone and he caused protracted impairment of the function of a member or organ of her body.

Plaintiff's Video shows facts that materially vitiate at least the great bodily harm element for the felony battery charge. It shows Plaintiff reacted reflexively to Mrs. Stone striking him in his face with his Bible and then remaining in close proximity. Mrs. Stone resumed speaking a few seconds later and within a minute or two resumed pacing around and yelling at Plaintiff. She had no visible injuries. These facts – combined with Mrs.

---

[17] In a recent case, a plaintiff claiming Fourth Amendment false arrest and malicious prosecution because the investigating detective (who viewed surveillance videos that recorded the entire incident) did not mention the video or include enough self-defense facts from it in obtaining the warrant for his arrest. The jury later acquitted him based on self-defense. The court held the law was not clearly established regarding whether the officer had to include self-defense facts in the warrant, or if so, at what level of detail. *Kapinski v. City of Albuquerque,* No. CV 18-716 SCY/GJF, 2019 WL 2602551, at *1 (D.N.M. June 24, 2019), *recon. denied,* 2019 WL 3936836 (D.N.M. Aug. 19, 2019), *appeal filed* Sep. 16, 2019.

Stone saying she did not want an ambulance – seem to negate that Plaintiff caused her great bodily harm. The other facts White represented in the Criminal Complaint to allege great bodily harm are also questionable in causation.[18] White obtained Mrs. Stone's statements that she was incapacitated on April 19 only by asking her leading questions. Mr. Stone had taken Mrs. Stone to the hospital the day of the incident, and she was not diagnosed with any injury at the time. Even if the hospital had told Mr. Stone to watch for symptoms for several days, most of the symptoms Mr. Stone reported were consistent with Mrs. Stone's aggressive behavior and slurred speech *before* Plaintiff pushed Mrs. Stone.[19] On the other hand, Loya-Lopez told White that Plaintiff used a large amount of force in pushing Mrs. Stone; White photographed a bump on Mrs. Stone's head the day after she fell; she complained of her head and back hurting within minutes of her fall; and in the video she did not exhibit the level of confusion Mr. Stone described to White on April 23. Under these circumstances, it was unreasonable for White to charge Plaintiff with a felony battery based on the severe concussion diagnosis five days after the incident, without trying to first see what Plaintiff's video showed regarding at least her injuries.

---

[18] White does not appear to argue Mrs. Stone's bruises and bump on her head constitute great bodily injury; White and the DA concluded those injuries supported only a misdemeanor.

[19] Plaintiff did not know Mrs. Stone. He testified in deposition he preached in public for years in several cities and towns, and no one had ever physically approached and interfered with him, other than one instance of a young man who stole some of his group's property while they were preaching. Craft Deposition, pp. 42-53. Although the Court is not obligated to review facts outside what Plaintiff argues in his briefs, it also appears undisputed that Plaintiff obtained records from Mrs. Stone's hospital visit in this time frame. Those records recited she was prescribed three drugs that Plaintiff's counsel and Wright characterize as narcotics for pain, muscle spasms and anxiety that could result in some appearance of confusion. Wright Deposition, pp. 88-91.

Plaintiff also submits that Officers Ellis and Thomas saw no probable cause at the time, and the deposition testimony of Sergeant McEachern and Officer Thomas that in watching the video, they saw no probable cause to arrest Plaintiff, as his conduct was at most a misdemeanor battery.[20]  In short, Plaintiff's Video shows lack of probable cause to believe Plaintiff caused great bodily injury to support the felony charge.

Moreover, White provides no evidence that he sought a warrant to arrest Plaintiff before he alleged the felony.  Under New Mexico law, a misdemeanor battery or disorderly conduct occurring outside an officer's presence are arrestable offenses on a warrant.  *See, e.g.,* N.M.S.A. § 29-3-8.1A ("A person may petition the department to expunge arrest information on the person's state record or federal bureau of investigation record if the arrest was for a misdemeanor or petty misdemeanor offense and the arrest was not for a crime of moral turpitude").[21]  However, Defendant Wright testified that misdemeanors outside an officer's presence – once the city attorney reviews the case and decides to bring the charge – would lead only to a summons.  Wright Deposition, p. 96.  Similarly, McEachern and Ellis respectively testified in deposition an arrest would not be appropriate

---

[20] Defendants argue the Court should give deference to the magistrate's decision to grant the warrant.  As a general principle, that would be correct if Plaintiff did not assert the warrant was based on a materially false and misleading criminal complaint.  Plaintiff submits an affidavit from the magistrate judge (Plaintiff's Ex. 8) implying he would not have found probable cause for the felony if he had seen Plaintiff's video.  However, based on the Court's own review of the videos and the deposition testimony of Ellis, McEachern, and Thomas, the Court already concludes probable cause was lacking for the felony charge.  Because the magistrate's affidavit does not affect the analysis on summary judgment, the Court does not consider its admissibility.

[21] New Mexico's "misdemeanor arrest rule" appears to regard only warrantless arrests.  *See, e.g., State v. Reger*, 236 P.3d 654, 658 (N.M. Ct. App. 2010) (citing *City of Las Cruces v. Sanchez*, 210 P.3d 212, 214 (N.M. 2009)).

for the conduct in Plaintiff's Video, and they had never seen anyone arrested for such offenses.[22] The record reflects at least a material fact dispute whether without the felony charge, White would have sought an arrest warrant at all.

White assumes he can nevertheless immunize himself for false statements and knowing or reckless omissions in charging Plaintiff with the *felony* without probable cause, simply by including the misdemeanor battery or disorderly conduct charge for which he did have probable cause.  White cites *United States v. Turner,* 553 F.3d 1337, 1344 (10th Cir. 2009).  *Turner* held "the probable cause inquiry is not restricted to the particular offense, but rather requires merely that officers had reason to believe that a crime – any crime– occurred."  Yet *Turner* regards a warrantless arrest.  Again, specificity in defining the context for qualified immunity is particularly important for the Fourth Amendment. *Emmons,* 139 S. Ct. at 503.  Officers generally have little time to reflect when they must decide whether to make a warrantless arrest, whereas drafting a Criminal Complaint for a warrant necessarily requires a reasonable amount of reflection and discussion with a prosecutor.  Felony charges also carry significantly greater burdens for the accused person than misdemeanors or petty misdemeanors.

White does not cite any cases to support that an officer is not liable for bringing a felony charge without probable cause as long as he also alleges lesser-included

---

[22] The criminal complaint somewhat confusingly refers to the DA having first approved pursuing aggravated battery as only a misdemeanor under N.M.S.A. § 30-3-5(B) (Warrant and Criminal Complaint, p. 7), then after learning of the concussion diagnosis, approved pursuing the third-degree felony aggravated battery (§ 30-3-5(C)).  There is only one criminal complaint in the record, and the order dismissing the charges recites they were filed on April 23, 2015.  It therefore appears White did not seek an arrest warrant based solely on misdemeanor battery and disorderly conduct.

31

misdemeanors for which there is probable cause.  Indeed, *Miller v. Spiers*, 339 F. App'x 862 (10th Cir. 2009) clearly established the contrary: an officer cannot avoid liability for charging a felony without probable cause, just by including lesser offenses for which there was probable cause.  *Miller* held the plaintiff stated a Fourth Amendment malicious prosecution claim[23] regarding murder and kidnapping charges, regardless that he was convicted for a lesser offense (evidence tampering).  "[T]he common law of malicious prosecution ... allows a plaintiff to challenge prosecutions on a charge-by-charge basis." *Id.* at 867-68.

Since *Miller*, it appears the Tenth Circuit has not addressed this precise issue again where a plaintiff asserted malicious prosecution regarding a felony charge but there was probable cause for a lesser offense.  In *Van De Weghe v. Chambers*, 569 F. App'x 617 (10th Cir. 2014), the Tenth Circuit found the law was not clearly established that a plaintiff could state a malicious prosecution claim despite probable cause existing for one of the several charges brought against him.  But *Van De Weghe* did not address the situation presented here, in which at best there was probable cause only for a lesser-included offense, and the officer sought a warrant only after he (unreasonably) believed he could bring a felony charge. *Id.* at 619.

In *Mocek v. City of Albuquerque*, 813 F.3d 912 (10th Cir. 2015), the court held New Mexico's common law tort for malicious abuse of process required the plaintiff who was charged with more than one offense must show a "manifest" lack of probable cause for the

---

[23] The court found that because the plaintiff was arrested on a warrant, the most analogous tort action was for malicious prosecution. *Miller*, 339 F. App'x at 866-67.

criminal complaint "as a whole." Because there was probable cause for one of the four misdemeanors or petty misdemeanors with which Mocek was charged, his malicious abuse of process claim failed. *Id.* at 936-37. However, like *Van De Weghe*, the case did not involve a felony charge that lacked probable cause and was the only reason the plaintiff was arrested.

Hence, on the second prong of qualified immunity – clearly established law at the time of the arrest – Plaintiff has met his burden for surviving summary judgment. As of April 2015, it was clear under *Baptiste* that an officer cannot ignore a known, accessible video of the alleged crime and simply rely on witness statements before making an arrest. *Miller* made plain that charging a felony when there is probable cause only for a lesser offense supports a Fourth Amendment malicious prosecution claim, and no subsequent cases have muddied the waters. Defendant has not shown a lack of material fact disputes to support qualified immunity. Accordingly, White is not entitled to summary judgment on the Fourth Amendment false arrest claim.

### D.    *Fourth Amendment Malicious Prosecution*

Fourth Amendment malicious prosecution requires "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes,* 528 F.3d 790, 799 (10th Cir. 2008).

White argues Plaintiff's claim fails not only for lack of probable cause (which the Court rejects, based on the analysis above) but also for lack of favorable termination of the

charges.   White argues this element requires the charges were dismissed for reasons

indicative of innocence and not on technical grounds having little or no relation to his guilt.

*M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016).   The charges against Plaintiff were

dismissed upon Plaintiff's motion alleging violation of his speedy trial rights.   Defendants'

Ex. 9.   White cites *Cordova v. City of Albuquerque*, 816 F.3d 645, 652 (10th Cir. 2016) as

declining to adopt a rule that speedy trial dismissals are *per se* indicative of innocence.

> [I]n *Wilkins* ... the prosecutor had dismissed the underlying charges by filing
> a so-called *nolle prosequi*—a voluntary dismissal of charges. ... We found
> the mere fact that a prosecutor had chosen to abandon a case was insufficient
> to show favorable termination.   Instead, the termination must in some way
> "indicate the innocence of the accused." ... (quoting Restatement (Second)
> of Torts § 660 cmt. a (1977)).   When it is unclear whether the termination
> indicates innocence, we "look to the stated reasons for the dismissal as well
> as to the circumstances surrounding it" and determine "whether the failure to
> proceed implies a lack of reasonable grounds for the prosecution." ... Or, as
> a leading treatise put it, the abandonment of prosecution that "does not touch
> the merits ... leaves the accused without a favorable termination." Dan B.
> Dobbs et al., Dobb's Law of Torts § 590 (2d ed.2015).

*Cordova*, 816 F.3d at 651.   *Cordova* found the dismissal in that case did not meet this

element because the state had not abandoned the charges, and nothing else in the record

suggested the dismissal was indicative of innocence.   But the court noted:

> Although the traditional [favorable termination] requirement may bar some
> meritorious actions, where prosecutorial delay *does* indicate the innocence
> of the accused the plaintiff will not be barred from bringing his malicious
> prosecution claim under our rule.

*Id.* at 654.

White focuses on the state court's finding that the state's 14-month delay was not

"deliberate," but in *Barker v. Wingo* terms, this only means it was not "[a] deliberate

attempt to delay the trial in order to hamper the defense."   *State v. Garza*, 212 P.3d 387,

396 (N.M. 2009) (quoting *Barker*, 407 U.S. at 531). The state court did find prejudice in part because Mrs. Stone "may have since suffered further unrelated health concerns that may come to play in a trial of this matter, thereby prejudicing the jury unfairly." Defendants' Ex. 9. This fact shows the charges were dismissed at least in part for reasons not necessarily relating to Plaintiff's innocence.

On the other hand, the dismissal order notes the state sought two continuances and does not state why. Plaintiff also argues the state made several plea offers to him, each of which he rejected. Plaintiff argues the state made the offers because it lacked evidence.[24] Defendants did not dispute these assertions at oral argument. In addition, the state failed to oppose Plaintiff's motion to dismiss. Either the state believed the case for prejudicial delay was strong or the charges were weak – or some combination of the two. Thus, looking to the stated reasons for the dismissal as well as the circumstances surrounding it, particularly Plaintiff's assertion regarding the state's plea offers, Plaintiff has shown at least a material fact dispute "whether the failure to proceed implies a lack of reasonable grounds for the prosecution." *Cordova*, 816 F.3d at 651. This is sufficient for the claim to survive summary judgment.

In short, White is not entitled to qualified immunity in his individual capacity on the Fourth Amendment malicious prosecution claim.

---

[24] Plaintiff also asserts the state filed a *noli prossequi* (voluntary dismissal), but Plaintiff did not provide a copy. Defendants disputed this assertion in oral argument, and Plaintiff then argued the Plaintiff's Video is indicative of innocence. The Court is unaware of any case finding this element can be met by pointing to evidence on which the plaintiff would have relied if the underlying charges had not been dismissed.

E.    First Amendment Claim[25]

Because Plaintiff was arrested pursuant to a warrant – which is the initiation of legal

process – and asserts the warrant and all following confinement and prosecution were in

retaliation for his exercising his rights of free speech and religion, Plaintiff's First

Amendment claim appears to be one for retaliatory prosecution. *See, e.g., Reichle v.*

*Howards,* 566 U.S. 658, 667 (2012) (claim of retaliatory arrest for warrantless arrest,

distinguishing retaliatory prosecution addressed in *Hartman v. Moore*, 547 U.S. 250, 254

(2006) for charges by grand jury indictment).

> "[A]s a general matter the First Amendment prohibits government officials
> from subjecting an individual to retaliatory actions" for engaging in protected
> speech. ... If an official takes adverse action against someone based on that
> forbidden motive, and "non-retaliatory grounds are in fact insufficient to
> provoke the adverse consequences," the injured person may generally seek
> relief by bringing a First Amendment claim.
>
> To prevail on such a claim, a plaintiff must establish a "causal
> connection" between the government defendant's "retaliatory animus" and
> the plaintiff's "subsequent injury." ... It is not enough to show that an official
> acted with a retaliatory motive and that the plaintiff was injured—the motive
> must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that
> the adverse action against the plaintiff would not have been taken absent the
> retaliatory motive. ... [A]lthough it "may be dishonorable to act with an
> unconstitutional motive," an official's "action colored by some degree of bad
> motive does not amount to a constitutional tort if that action would have been
> taken anyway[.]"

*Nieves v. Bartlett,* 139 S. Ct. 1715, 1722, 204 L. Ed. 1 (2019) (quoting *Hartman,* 547 U.S.

at 256-60). *Nieves* and *Hartman* refer to retaliation for protected speech, but the same

---

[25] In his current complaint, Plaintiff includes a citation to the Fourteenth Amendment for this claim
as well because its "liberty" provision makes the First Amendment applicable to states. *McIntyre
v. Ohio Elections Comm'n,* 514 U.S. 334, 336 n.1 (1995).

standards apply for engaging in any other conduct protected by the First Amendment, including the free exercise of religion. *See, e.g., Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007) (stating the same elements for retaliation for exercising the right to petition).

> For retaliatory prosecution claims,
>
> "proving the link between the defendant's retaliatory animus and the plaintiff's injury ... 'is usually more complex than it is in other retaliation cases.'" ... Unlike most retaliation cases, in retaliatory prosecution cases the official with the malicious motive does not carry out the retaliatory action himself—the decision to bring charges is instead made by a prosecutor, who is generally immune from suit and whose decisions receive a presumption of regularity. ... Thus, even when an officer's animus is clear, it does not necessarily show that the officer "induced the action of a prosecutor who would not have pressed charges otherwise." ...
>
> To account for this "problem of causation" in retaliatory prosecution claims, *Hartman* adopted the requirement that plaintiffs plead and prove the absence of probable cause for the underlying criminal charge.

*Nieves*, 139 S. Ct. at 1723 (quoting *Hartman*, 547 U.S. at 261-63).

In this case, Plaintiff has shown the warrant lacked probable cause because under *Baptiste*, a prudent person would not find the facts known to White reasonably trustworthy without attempting to view Plaintiff's video. Therefore, Plaintiff has met the lack of probable cause element for his First Amendment claim as well. Plaintiff also shows at least material fact disputes to support White had retaliatory animus that was the but-for cause of Plaintiff's arrest and prosecution. In opposing summary judgment, Plaintiff submits evidence from which a reasonable factfinder could conclude White pursued Plaintiff's arrest and prosecution because of the content of Plaintiff's protected speech and exercise of religious belief: the evidence that shows a dispute whether probable cause existed for

the felony charge; the facts supporting that similarly-situated persons were not arrested or prosecuted for similar conduct; [26] White's statement to the Stones (in his Audiorecording) that he knows Plaintiff has been preaching "down with the white people," arguably expressing his desire to stop Plaintiff's preaching; White's seeming bias in favor of Mr. and Mrs. Stone in his interview of Mrs. Stone;[27] and what Plaintiff describes as the Stones' quest to influence the police department to stop Plaintiff's preaching through the influence of Mr. Stone's friend who was a city commissioner (an intent Mr. Stone expressed in both Ellis's Audiorecording and White's Audiorecording).[28] Although White cites to Plaintiff's concession in his deposition that he did not know of a reason to think his arrest was based on religious discrimination, Plaintiff was testifying about his personal knowledge, not the evidence his attorneys obtained in the case.

---

[26] Plaintiff's description of Mrs. Stone's conduct – even without seeing Plaintiff's Video – arguably gave probable cause to believe she committed disorderly conduct and misdemeanor battery. She yelled profanity, attempted to physically and visually interfere with his preaching, and struck him in the face with his Bible. Her conduct disturbed at least Plaintiff, and as they were in a public square with bystanders, her conduct tended to disturb the peace of others. Yet Mrs. Stone was not investigated or arrested. White may argue this is because Plaintiff did not pursue charges against Mrs. Stone, but this evidence is at least relevant to the question of White's motivation in charging Plaintiff.

[27] White testified in deposition that he knew Mr. Stone from being a customer of his store. White's Audiorecording includes several exchanges with Mr. and Mrs. Stone from which a reasonable factfinder could conclude White predetermined to help them get Plaintiff arrested. Mr. Stone said "his dreams came true" when he learned White was on the case; White told the Stones they had a fantastic witness in Mr. Loya-Lopez; White assured Mrs. Stone that he was on the case and everything would be OK.

[28] Plaintiff also submits evidence more general to the Hobbs Police Department that may have some relevance: an undated surveillance photo of Plaintiff preaching at Shipp Street Plaza, produced by the Hobbs Police Department in discovery (Plaintiff's Ex. 9); and Plaintiff's deposition testimony that Hobbs police cars had several times parked at length in an area behind him while he preached, apparently watching him.

In addition, if the Court considers Plaintiff's First Amendment claim as one for retaliatory arrest, *see, e.g., Esparza v. Bowman,* 523 F. App'x 530 (10th Cir. 2013), the result is not different. For such a claim, the plaintiff must show:

> (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. * * * "She must also plead and prove the absence of probable cause."

*Id.* at 535 (quoting *Becker v. Kroll,* 494 F.3d 904, 925 (10th Cir. 2007)).

White does not dispute Plaintiff was engaged in constitutionally protected activity, nor that White's arrest by warrant (if without probable cause) would chill a person of ordinary firmness. *See, e.g., Esparza,* 523 F. App'x at 536. Plaintiff has already shown a lack of probable cause, and the same facts that support material disputes as to retaliatory motive and but-for causation likewise would cause White to not be entitled to summary judgment on qualified immunity for a retaliatory arrest claim either.[29]

As to the second prong of qualified immunity, the law has been clearly established since at least *Hartman* that an officer violates the First Amendment if he arrests a person without probable cause because the person engaged in protected speech or religious expression. White is not entitled to qualified immunity on Plaintiff's First Amendment claim in his individual capacity.

---

[29] The significant difference between the two claims appears to be that if these events occurred after *Nieves,* Plaintiff would not need to show a lack of probable cause, if he showed objective evidence that similarly situated persons were not arrested in the absence of protected speech or religious expression – but that law was not clearly established until *Nieves.*

IV.    *Official Capacity Claims*

This brings the Court to the official capacity claims.  An official capacity claim "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."  *Hafer v. Melo*, 502 U.S. 21, 24 (1991) (citation omitted, citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Monell v. Dept of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)).  In this case, the governmental entity of which Wright and White were agents at the time is the City of Hobbs.  Where, as here, the City received notice and opportunity to respond, these claims are treated as a suit against the City.  However, it is not plain from the Fourth Amended Complaint whether Plaintiff asserts a theory of municipal liability, *i.e.,* what legal theory Plaintiff intends for the official capacity claims.

> Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's 'policy or custom' must have played a part in the violation of federal law. For the same reason, the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses.

*Hafer,* 502 U.S. at 25 (internal quotation marks and citations omitted, citing *Graham*, 473 U.S. at 166; *Monell*, 436 U.S. at 694).

At oral argument, Plaintiff's counsel stated Plaintiff has no municipal liability claim. In the current pleading, the claims against Wright and White as being in their individual and official capacities is only a matter of form intended to state the § 1983 claims against them as individuals.  Accordingly, the official capacity claims are dismissed.

V.    *Conclusion*

For the reasons stated above, the Court GRANTS Defendant Wright's motion for summary judgment on all claims against him.

40

The Court GRANTS IN PART Defendant White's motion for summary judgment as to the official capacity claims against him, and DENIES IN PART as to the individual capacity claims against White.  Plaintiff's claims against White in his individual capacity under the Fourth and First Amendments shall proceed.

IT IS SO ORDERED.

Dated this _____ day of December, 2019.

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE

41